LORETTA M. HARHEN *vs.* STEPHEN L. BROWN & others.[1]

No. 97-P-2126.

Suffolk. March 10, 1999. - May 21, 1999.

Present: WARNER, C.J., SMITH, & GILLERMAN, JJ.

Further appellate review granted, 430 Mass. 1106 (1999).

*Practice, Civil,* Dismissal, Complaint. *Corporation,* Mutual life insurance corporation, Board of directors, Stockholder's derivative suit, Special litigation committee, Business judgment rule, By-laws, Officers and directors. *Fiduciary. Limitations, Statute of.*

In a derivative action brought by a policyholder against directors and officers of an insurance company, the complaint alleged with sufficient particularity the events and conduct of the defendants which, if established as true, supported the plaintiff's claims that the defendants violated their duty of care in failing properly to direct and manage the affairs of the corporation and violated their duty of loyalty to the corporation due to their own conflicts of interest; the judgment dismissing the case was reversed and the matter remanded for further proceedings. [802]

In the circumstances of a derivative action, the defendant directors and officers did not demonstrate, on a motion to dismiss, that the business judgment rule was applicable to protect their actions. [803-811]

In a derivative action, the defendant directors' and officers' assertions that dismissal of the action was required by provisions of the corporate by-laws [811-814] and that the complaint was time-barred [814] were not supported by the materials submitted in support of their motion to dismiss the complaint.

Policyholders in a mutual insurance company may sue derivatively on behalf of the corporation. [814-815]

In a derivative action against a mutual insurance company, prior to which the policyholder's demand upon the corporation was effectively refused by the directors, demand upon the some seven million other policyholders of the mutual insurance company, otherwise required, was excused, where, in the circumstances, it would be "impossibly burdensome." [815-816]

[1]E. James Morton, David F. D'Alessandro, Raeburn B. Hathaway, Jr., F. William Sawyer, and John Hancock Mutual Life Insurance Company (nominal defendant).

CIVIL ACTION commenced in the Superior Court Department on March 21, 1997.

The case was heard by *Allan van Gestel*, J., on motions to dismiss.

*Alan Morrison* for the plaintiff.

*Jeffrey B. Rudman* for Stephen L. Brown & others.

*Thomas R. Kiley*, for F. William Sawyer, was present but did not argue.

*Morris M. Goldings & Ellen S. Shapiro*, for Raeburn B. Hathaway, Jr., were present but did not argue.

GILLERMAN, J. The plaintiff, a policyholder of John Hancock Mutual Life Insurance Company (Hancock) brought this derivative action by verified complaint against Stephen L. Brown, E. James Morton, and David F. D'Alessandro, directors and senior officers of Hancock, Raeburn B. Hathaway, a vice-president of Hancock and head of its government relations department, F. William Sawyer, the senior registered lobbyist for Hancock, and Hancock as nominal defendant. Brown, Morton, and D'Alessandro are referred to collectively as the Hancock defendants.

The complaint alleges that the individual defendants participated in, or approved, the illegal lobbying of members of the Massachusetts Legislature, resulting in fines and legal expenses paid by Hancock and harm to Hancock's reputation. The plaintiff seeks the recovery of those payments and losses for the benefit of Hancock.

The Hancock defendants moved to dismiss the complaint on the grounds that (i) the complaint fails to allege particularized facts sufficient to overcome the "strong presumption of the business judgment rule," and (ii) the complaint fails to state any claim upon which relief may be granted, see Mass.R.Civ.P. 12(b)(6), 365 Mass. 754 (1974). Hathaway moved to dismiss the complaint on the grounds that the complaint is "time-barred" and fails to state a claim upon which relief may be granted. Sawyer moved to dismiss the complaint pursuant to Mass.R.Civ.P. 12.

A judge of the Superior Court dismissed the action, explaining that the complaint lacked the required specificity on the issue of the bias and lack of independence of the board-appointed special committee of two directors, and therefore the judge "defer[red] totally to the business judgment of the Hancock sub-committee and the Hancock board [of directors] on all is-

sues presented in the plaintiff's demand."[2] The plaintiff has appealed.[3]

1. *Standard of review.* We treat the judge's decision dismissing the complaint against all defendants as a dismissal on the ground the complaint failed to state a claim against any defendant upon which relief may be granted.

It is settled law that in testing the correctness of a dismissal for failure to state a cognizable claim "we accept as true all of the allegations of the complaint and all reasonable inferences which may be drawn from the complaint and which are favorable to the party whose claims have been dismissed [citation omitted]. Further, a motion to dismiss a complaint on such grounds should not be allowed unless it appears *certain* that the complaining party is not entitled to relief under any state of facts which could be proved in support of his claim." (Emphasis added.) *Spinner* v. *Nutt*, 417 Mass. 549, 550 (1994), quoting from *Logotheti* v. *Gordon*, 414 Mass. 308, 310-311 (1993). See *Brum* v. *Dartmouth*, 44 Mass. App. Ct. 318, 321-322 (1998) (collecting cases), *S.C.*, 428 Mass. 684 (1999).[4]

2. *The complaint.* The following is a summary of the material allegations in the plaintiff's fifty-page complaint filed March 21, 1997.

a. *Description of the defendants.* Since 1991, Brown has been chairman of the board of directors and chief executive officer of Hancock. Prior thereto he served as vice-chairman of the board, president, and chief operating officer.

---

[2]The dismissal was without prejudice to move to file an amended complaint. At oral argument before this court, the plaintiff acknowledged her election to stand on the complaint as filed.

[3]See *State Ethics Commn.* v. *John Doe*, 417 Mass. 522 (1994), for proceedings at an earlier stage in the controversy surrounding Hancock's lobbyists.

[4]The Hancock defendants, citing cases from Delaware and certain Federal decisions, suggest in a footnote that a "Rule 23.1 motion should be reviewed under the deferential abuse of discretion standard." Massachusetts Rule of Civil Procedure 23.1, 365 Mass. 768 (1974), sets forth certain pleading requirements which depart from the usual requirement of notice pleading. *Heit* v. *Baird*, 567 F.2d 1157, 1160 (1st Cir. 1977). A failure to comply with those requirements may provide a basis for a motion to dismiss the action for failure to state a cognizable claim. See Mass.R.Civ.P. 12; *Heit* v. *Baird*, *supra* at 1162. The Hancock defendants acknowledge that there is no Massachusetts authority supporting their suggestion that a "deferential abuse of discretion" standard of review is applicable to a motion to dismiss in cases involving rule 23.1, and we reject the proposal as inconsistent with Massachusetts law, as described in the text, *infra*.

Morton was Brown's predecessor; he served as chairman of the board and chief executive officer from 1987 to 1991, and thereafter he remained a director and officer of Hancock.

D'Alessandro was senior executive vice-president of Hancock's retail sector until becoming president of Hancock on January 1, 1998. He also served as a director of Hancock at all material times.

From 1982 through May, 1993, Hathaway was a vice-president of Hancock and head of Hancock's government relations department.

Sawyer was Hancock's senior registered lobbyist and was responsible for Hancock's relations with the Massachusetts Legislature. He was neither an officer nor a director of Hancock.

b. *Description of Hancock.* Hancock is alleged to be one of the "top six" life insurance companies in the United States, chartered in Massachusetts in 1862. It has approximately seven million policyholders in all fifty states, over ten thousand employees, one hundred twenty subsidiaries, and "over $107 billion in managed assets and over $54 billion in direct assets." Hancock is headquartered in Massachusetts, which is Hancock's primary regulator. Therefore, the laws of Massachusetts, and the members of the Legislature's joint committee on insurance, are, according to the complaint, of the "utmost importance to Hancock."

c. *Hancock's government relations department.* This department was responsible for monitoring Massachusetts legislation relating to insurance and presenting Hancock's positions on such legislation to members of the Legislature. Hathaway was the head of this department and a vice-president of Hancock. Hathaway reported directly to the president of Hancock, a position held by Morton until 1991, and by Brown from 1991 until 1998, when D'Alessandro became president.

Sawyer, a licensed attorney, was Hancock's senior registered lobbyist, responsible for maintaining Hancock's good relations with members of the Massachusetts Legislature. To that end, Sawyer, as described more fully below, entertained legislators at golf clubs, hotels, restaurants, and cultural and sporting events in Massachusetts and elsewhere. Sawyer prepared monthly expense reports, detailing his activities, for approval by Hathaway. Sawyer also prepared regular written reports about proposed legislation of interest to Hancock which were circulated among Hancock's senior officers.

d. *Hancock's management committee.* Brown, Morton, D'Alessandro, and Hathaway were members of Hancock's management committee. This committee was responsible for overseeing all aspects of Hancock's operations, including government relations. Members of the committee were kept informed of Sawyer's activities with members of the Legislature and other government officials, and they "knew or should have known" of what subsequently was revealed as Sawyer's illegal activities. The individual defendant directors, as members of the management committee, failed to take any action to assure Sawyer's compliance with the law, and "they authorized [Hancock's] funds to be used in connection with Sawyer's illegal lobbying activities."

e. *Sawyer and the government relations department.* Hancock's government relations department was aware, beginning in 1979, that Hancock's lobbyists were prohibited from making any gift worth $50 or more on any single occasion, or gifts with an aggregate value of $100 in any calendar year, including meals and all other forms of entertainment, to any public official. Moreover, Hancock, at all material times, had a written policy prohibiting any gift of $50 or more to any person "with whom [Hancock] has or is likely to have any business dealings."

In 1982, Morton, as president of Hancock, personally approved payment of the cost of Sawyer's membership in a private golf club because, Hathaway's written memorandum stated, "this membership for [Sawyer] . . . would greatly enhance opportunities for him to perform his responsibilities." It was foreseeable, when Morton approved Sawyer's golf club membership, that Sawyer would use the privileges of the golf club to exceed the legal limit on gifts to legislators.

As part of a larger pattern, Hancock maintained corporate boxes at the Boston Garden, Foxboro Stadium, and Fenway Park. Tickets were made available to persons selected by board members, senior management, and Hathaway and Sawyer. Records were also maintained of the Hancock personnel to whom such tickets were "charged." These records show numerous charges to Sawyer and the government relations department revealing, according to the complaint, "per se violations of the lobbying law." Further, in 1982, Sawyer was granted permission to take the then chairman of the Legislature's joint insurance committee and his wife to the Super Bowl at a cost far in excess of the legal limit.

In addition to the foregoing, Sawyer provided entertainment for public officials at Las Palmas del Mar, Puerto Rico; Amelia Island, Florida; and Cape Cod.

Sawyer maintained itemized expense records for the government relations department. Hathaway, a member of Hancock's management committee, reviewed these records, "which included the identity of each legislator entertained on each of many occasions, and approved payment of these expenses."

In violation of Hancock's own policy prohibiting gifts exceeding $50 in value, no steps were taken by the management committee or the board to ensure that box seats, tickets, meals, and other gifts of various sorts were not in violation of Massachusetts laws.

f. *The 1994 Federal and State proceedings against Hancock; Hancock's admissions of violations of law.* In March, 1994, Hancock paid a fine of $900,000 to the Federal government in settlement of a civil complaint brought in the Federal District Court for the District of Massachusetts charging that from January, 1986, until May, 1993, Hancock's lobbyists, in violation of Massachusetts law, gave gratuities valued at over $50 each to Massachusetts legislators on at least three hundred occasions. The gifts were alleged to have been given as part of a "scheme to defraud the public of its right to the honest services of . . . members of the Massachusetts Legislature." See 18 U.S.C. § 1341 (1994); G. L. c. 268A, § 3.

The settlement agreement[5] between Hancock and the United States Attorney's office recited the following: "Hancock publicly acknowledged that certain lobbying activities by members of the Government Relations Department violated Massachusetts law, in particular, M. G. L. c. 268A, § 3(a)." Hancock agreed to reorganize its government relations department and to retain outside counsel to review its State lobbying and government relations activities. Hancock also agreed to implement new auditing procedures for its government relations

---

[5]The settlement agreement with the Federal authorities and the disposition agreement with the State Ethics Commission appear in Hancock's supplemental appendix, as do Hancock's by-laws and the transcript of Sawyer's sentencing hearing. Since these documents are referred to in the complaint, it is not inappropriate for the documents to be reproduced by the defendants in their entirety and for this court to consider the documents, without converting the motion to dismiss into a motion for summary judgment. See *Shaw* v. *Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996).

department, to be conducted by its independent, public accountants; acknowledged that it had accepted the early retirement of Hathaway and reassigned Sawyer to a position with non-lobbying activities; placed a moratorium on any expenditures for the entertainment of Massachusetts State legislators; instituted new written operating procedures, reporting guidelines, and periodic record audits for all future State lobbying activity; held a training session for all government relations employees concerning Massachusetts lobbying laws and their application; and updated Hancock policy regarding the entertainment of public employees and support of Massachusetts campaign activities and distributed that policy to all relevant personnel.

At the same time, as a result of proceedings brought by the State Ethics Commission (commission), Hancock and the commission entered into an eighteen-page disposition agreement. This agreement recited that the commission and Hancock had agreed to certain facts: that Hancock maintained a government relations department to monitor proposed legislation; that Hathaway, a vice-president, was the department head who "answered directly to Hancock's president"; that Sawyer was the senior lobbyist "responsible for Massachusetts legislation"; that according to the internal records of the government relations department, between 1985 and 1993, the department identified approximately 125 bills that were filed annually which were of interest to Hancock; that of those, approximately ten bills were annually enacted into law; that Sawyer did develop "strong, effective, personal relationships with Massachusetts legislators"; that Hathaway's written evaluation of Sawyer was that he was "a most effective representative of John Hancock's interests"; that many of the bills identified by the government relations department were "either enacted or defeated, due at least in part, to the efforts of the Hancock's lobbyists"; that "[o]ne way Hancock's lobbyists created strong relationships with Massachusetts legislators was by entertaining them through meals and drinks, golf, and sporting and theatrical events. In other words, the entertainment created and/or furthered goodwill and personal relationships which, in turn, helped achieve access to the legislators"; that between August 1, 1987, and May 30, 1993, Hancock's lobbyists entertained individual Massachusetts legislators with meals and golf worth $50 or more on approximately 240 instances; that the value of this entertainment

was approximately $26,000; that frequently the expenses of the legislator's spouse or guest were also covered, and that many of the meals took place at out-of-State settings including the Virgin Islands, Florida, and Puerto Rico; that between August 1, 1987, and June 30, 1993, at least sixty instances of corporate box seats were made available to Massachusetts legislators; and that, in total, there were "at least 300 instances" of gifts exceeding $50 in entertainment value to Massachusetts legislators.

The agreement also recites that Hancock's legal department repeatedly warned the government relations department, by written memoranda beginning in 1979, of the prohibitions and limitations on gifts to public officials; and that the government relations department "paid particularly close attention to the commission's Flaherty decision issued on December 10, 1990" (Legislature's majority leader violated G. L. c. 268, § 3, by accepting six Celtics tickets from billboard company's lobbyists).

Based on these violations of G. L. c. 268A, § 3(*a*), the commission imposed a civil fine of $110,000, and for a period of five years, ending December 31, 1998, Hancock was required to file semiannual written reports of all expenditures made by Hancock, directly or indirectly, involving any Massachusetts State, county, or municipal employee. Hancock "waive[d] all rights to contest the findings of fact, conclusions of law and terms and conditions contained in [the] agreement in any related administrative or judicial proceeding to which the Commission is or may be a party."

The agreement was signed by Bruce Skrine, corporate secretary, on behalf of Hancock, and he stated his understanding that the agreement "is a public document."

g. *Additional expenses paid by Hancock.* In addition to the $1,010,000 in fines paid by Hancock to Federal and State authorities, the complaint alleges, on information and belief, that Hancock paid $1.2 million in legal fees indemnifying Sawyer for his expenses in defending Federal criminal charges (see G. L. c. 156B, § 67, regarding indemnification of employees of a corporation, made available to incorporated domestic mutual insurance companies by virtue of G. L. c. 175, § 30, and discussed *infra*) arising out of the same lobbying violations that Hancock admitted in its disposition agreement.[6] In all, it is

[6]Additional information regarding Sawyer appears in the Appendix to this opinion.

alleged that the total direct costs incurred by Hancock in this matter exceeded $4 million.

The complaint further alleges that the defendants Brown, Morton, and D'Alessandro, each of whom, as noted above, was a member of the board of directors and a senior officer of Hancock,[7] controlled the decisions of the board not to seek reimbursement from the culpable parties of costs and expenses incurred by Hancock "knowing that the investigations of illegal conduct could ultimately lead to findings of their own culpability, and thus they were in a position of conflict of interest."

h. *Demand and demand refused.* On April 8, 1996, the plaintiff delivered a twelve-page letter to the board of directors at the annual meeting of Hancock held on that date. The letter carefully, and in detail, recapitulated the events summarized above as well as asserted the responsibility of the directors and senior management for those events. The letter concluded with thirteen demands, including the demand that Hancock seek reimbursement from the responsible officers and directors for all costs and expenses arising out of the unlawful activities of the employees of the government relations department of Hancock.

On May 13, 1996, the board of directors referred the demand letter to a committee of two directors for "such action as the committee deems appropriate." The committee responded to the plaintiff's counsel by letter dated September 13, 1996. The letter states, "[W]e have carefully reviewed the actions of the Company, its Board of Directors and Officers in the handling of the Sawyer matter, and find that the investigation of the matter and the actions taken in response were entirely appropriate." No additional information was provided.

---

[7]We note that comment d to § 3.02 of American Law Institute Principles of Corporate Governance: Analysis and Recommendations, at 89 (1994), states that in a publicly held corporation "the management function is normally vested in the principal senior executives. A basic function of the board is to select these executives *and to oversee their performance . . .* to determine whether the business is being properly managed . . ." (emphasis added). In support of this comment, the treatise cites the Business Roundtable's Corporate Governance and American Competitiveness, 46 Bus. Law. 241, 246 (1990): "The primary function of the board of directors is the selection of the chief executive officer and concurrence with the CEO's selection of the company's top management team." As noted above, the defendant Brown is alleged to be chairman of the board of directors and chief executive officer of Hancock, and the defendants Morton and D'Alessandro are alleged to be directors and senior officers of Hancock.

On October 8, 1996, the plaintiff's counsel met with two senior Hancock employees. The employees were prepared to receive the plaintiff's proposals for amendments to the Hancock by-laws, but they "flatly and repeatedly refused to discuss or answer any questions or provide any information whatsoever on the matters" which were described in the demand letter.

We conclude that the pleading requirements of Mass.R.Civ.P. 23.1 (i.e., the complaint must allege with particularity the efforts made by the plaintiff to obtain the action she desires from the directors) were satisfied.

To sum up, based on the allegations of the complaint, reinforced and supplemented by the admissions and findings of fact in the settlement agreement and the disposition agreement, see note 5, *supra*, the complaint alleges with sufficient particularity the events and the conduct of the defendants which, if established as true, support the plaintiff's claims that the defendant Sawyer engaged in illegal lobbying activities from January, 1986, until May, 1993; that the defendant Hathaway assisted and approved Sawyer's illegal activities; that the Hancock defendants (i) violated their duty of care in failing, as directors, senior officers, and members of the management committee, properly to direct and manage the affairs of Hancock so that the illegal activities of Sawyer and the government relations department — of which the Hancock defendants knew or should have known — would not have occurred or persisted, and (ii) violated their duty of loyalty to Hancock by reason of the decisions of Brown, Morton, and D'Alessandro not to seek reimbursement from the culpable parties because of their own conflict of interest, see *Starr* v. *Fordham*, 420 Mass. 178, 184 (1995) (business judgment rule does not protect violations of duty of loyalty, such as where there is a conflict of interest), and by seeing to it that the fines paid to Federal and State authorities were from corporate assets, thereby wasting those assets. See generally *Demoulas* v. *Demoulas Super Markets, Inc.*, 424 Mass. 501, 528-529 (1997).

3. *Background: the corporate law applicable to this dispute.* General Laws c. 175 is devoted to the regulation of companies in the insurance business. The corporation laws applicable to mutual insurance companies incorporated in Massachusetts, of which Hancock is one, appear principally in § 30 of G. L.

c. 175.[8] See *Insurance Co. of N. America* v. *Commissioner of Ins.*, 327 Mass. 745, 754 (1951). Section 30(*a*)(1) of G. L. c. 175, as inserted by St. 1970, c. 876, § 7, provides that "[t]he general principles of law relative to the powers, duties and liabilities of corporations shall apply to all incorporated domestic companies" engaged in the insurance business.[9] Certain enumerated provisions of G. L. c. 156B are made applicable to incorporated domestic mutual insurance companies by § 30(*a*)(3) of G. L. c. 175. Chief among the enumerated provisions of G. L. c. 156B, for present purposes, are § 67 (indemnification of officers and directors) and § 13(*b*)(1½) (providing exculpatory provisions for directors). These provisions are discussed more fully below, as is the standing of policyholders to bring a derivative action.

Thus we may apply the common law applicable to corporations and those provisions of G. L. c. 156B which are expressly incorporated into G. L. c. 175 (reading "stockholders" as "members," i.e., policyholders, see G. L. c. 175, § 30[*a*][4]). In determining the common law applicable to corporations, we may look to the American Law Institute Principles of Corporate Governance: Analysis and Recommendations (1994). See *Demoulas* v. *Demoulas Super Markets, Inc.*, 424 Mass. at 523-530, citing the final draft of Principles of Corporate Governance; *Houle* v. *Low*, 407 Mass. 810, 819 (1990), applying selected provisions of tentative draft no. 8 (1988) of Principles of Corporate Governance; *Dynan* v. *Fritz*, 400 Mass. 230, 241 (1987), applying selected provisions of tentative draft no. 5 (1986).

4. *Discussion.* a. *Hancock's argument that its unbiased business decision is conclusive and requires dismissal of this action.* Hancock argues that the "business judgment rule supplies a presumption that corporate decisions are unbiased, informed, and made in good faith," citing *Aronson* v. *Lewis*, 473 A.2d 805, 812 (Del. 1984). From that presumption, Hancock argues that the board decision — that is, the response of the special

[8]See also c. 175, § 49, regarding the formation of a mutual company. Section 3 of G. L. c. 156B, and § 2 of G. L. c. 156, make those chapters inapplicable to corporations carrying on the business of an insurance company. However, c. 175 incorporates by reference various sections of c. 156B, as described in the text.

[9]"Company" is defined in § 1 of c. 175 to include all corporations and other legal entities "engaged as principals in the business of insurance . . . ."

committee — requires that the complaint be dismissed because the complaint does not even suggest that a majority of the board, or the special committee, was biased or disqualified by a conflict of interest. See *American Discount Corp.* v. *Kaitz*, 348 Mass. 706, 710-711 (1965). Absent group disqualification, the argument continues, the response of the special committee was a business decision protected by the business judgment rule and therefore not subject to further judicial scrutiny. There are several difficulties with this argument.[10]

*First*, it is alleged that the special committee responded to the plaintiff's demands on September 13, 1996, and rejected those demands substantially without explanation approximately six months before this action was filed. While the special committee was acting for the board, see note 16, *infra*, the rejection of the demand letter was not the equivalent of a board decision to terminate this derivative action. The Supreme Court of Delaware has emphasized the importance of recognizing the "discrete and quite different processes" involved in a special board committee formed to respond to stockholder demands and a special board committee formed to respond to a derivative action. See *Grimes* v. *Donald*, 673 A.2d 1207, 1216 n.13, 1218 (Del. 1996) (observing that it is "important that the demand process be meaningful").

The complaint contains no allegations or intimations that the Hancock board of directors, or a committee of the board, ever voted to terminate the derivative action; that vote, logically, could only occur after the commencement of the derivative action on March 21, 1997, and therefore would not be available to support the motion to dismiss. Since there is nothing in the complaint regarding a "business decision" by the Hancock board or committee to terminate this action, the business judgment rule offers no protection at this stage of the proceedings. See Principles of Corporate Governance, *supra* at § 4.01(c) comment c, at 174 (the business judgement rule "affords protection only to a 'business judgment.' This means that to be afforded protection a decision must have been consciously

---

[10]General Laws c. 156B, § 65, provides that compliance by an officer or director with the business judgment rule described in that section is a "complete defense" to any claim against that director or officer. That provision is not incorporated into c. 175. See G. L. c. 175, § 30(*a*)(2). As previously noted, G. L. c. 175, § 30(*a*) & (*b*), permits the application of general principles of corporate law to insurance companies.

made and judgment must, in fact, have been exercised"). There is no merit, then, to the argument that the board's decision is conclusive on the motion to dismiss.

*Second,* when we turn to the committee's September 13, 1996, reply to the plaintiff's demand letter, and assume that the committee's reply was equivalent to action by the board, see note 16, *infra,* Hancock fares no better.[11]

The plaintiff's twelve-page demand letter, as noted above, alleges (i) the years of the knowing, deliberate, illegal lobbying activity of Hancock's government relations department headed by Sawyer, (ii) the complicity of Hathaway, an officer of Hancock and member of the management committee, in approving the expenses of Sawyer while knowing that the expenditures were for the benefit of identified Massachusetts legislators and therefore were for an unlawful purpose, (iii) that Brown, Morton, and D'Alessandro, as directors, senior officers, and members of the management committee, either knew, or should have known, of Sawyer's illegal lobbying expenditures and activities, and (iv) the damage to Hancock in fines paid and reimbursement of Sawyer's legal fees. In a word, the demand letter was thoughtful, thorough, and addressed a matter of importance to the company. See *DiTomasso* v. *Loverro,* 250 A.D. 206, 209, aff'd, 276 N.Y. 551 (1937) (directors liable for damages, in derivative action, "where they knew, or should have known, the contract" was in restraint of trade and thus illegal). See also Principles of Corporate Governance, *supra* at § 4.01(a) comment d, at 149-150 ("a director or officer violates the duty to perform his or her functions in good faith if he or she knowingly causes the corporation to disobey the law"); *Wilshire Oil Co. of Texas* v. *Riffe,* 409 F.2d 1277, 1283-86 (10th Cir. 1969) ("fiduciary duty" owed to the corporation by employees whose antitrust violations subjected the corporation to civil and criminal penalties).

The singularly brief response of the special two person board committee (whose individual qualifications for membership on the committee are challenged as "not disinterested"[12]) to the plaintiff's demand letter stated that the committee "reviewed the actions of the . . . Board and Officers in the handling of the

---

[11]We note, however, that Hancock's brief acknowledges that "the [b]oard did not create the [s]ub-[c]ommittee to address pending litigation."

[12]However, the allegations of the complaint do not adequately make a case for the two board members of the committee being "interested."

Sawyer matter," and concluded that the "actions taken in response were entirely appropriate."

This response — if *any* concrete meaning can be gleaned from the few words of the committee's letter — would seem to refer to Hancock's decisions to enter into the settlement agreements with the Federal and State authorities, pay the required fines, and carry out the extensive and detailed remedial programs required by the settlement agreement with the United States Attorney's office.

However that may be, the committee's letter did not address the plaintiff's demands that the directors and officers responsible for approving or condoning the illegal conduct of the government relations department be identified and held personally responsible. The committee's response, to put it simply, was a refusal to discuss the plaintiff's demands, a posture that was again assumed when two officers of Hancock met with plaintiff's counsel on October 8, 1996, and "flatly and repeatedly refused" to discuss the plaintiff's claims, as noted above.

However, given Hancock's admission in the settlement agreement with the Federal authorities that "certain lobbying activities by members of [Hancock's] Government Relations Department violated Massachusetts law," and the payment of fines in excess of one million dollars, there was a need to explore the events that culminated in the Federal and State proceedings, and to identify those directors, officers, or employees, if any, responsible for permitting Sawyer's illegal activities to continue openly for years, and, if identified, to decide what should be done (or not done), and why. None of that information was forthcoming.

So far as we are aware, no Massachusetts appellate decision has considered the effect of a rejection of a stockholder demand preceding a derivative action. The subject is at least potentially important, for § 7.04 of 2 Principles of Corporate Governance, *supra*, makes it clear that if independent directors "capable . . . of objective judgment" reject the demands *and* provide "specific reasons" for doing so, then the complaint may be dismissed without further proceedings unless the complaint pleads, with particularity, facts that "raise a significant prospect" that the statements in the reply are not correct, are legally insufficient, or that "disinterested directors could not reasonably have determined that rejection of the demand was in the best interests of the corporation." *Id.* at § 7.04(a)(2). Compare *Grimes* v.

*Donald*, 673 A.2d at 1218 ("A stockholder who makes a seri-ous demand and receives only a peremptory refusal has the right to . . . obtain the relevant corporate records . . . to determine whether or not there is a basis to assert that demand was wrongfully refused").

Here, the pre-litigation special committee did not provide any information in response to the plaintiff's demands and could not respond to the plaintiff's complaint. This much is conceded by Hancock. See note 11, *supra*. Since we have concluded that the complaint is facially adequate, Hancock's motion to dismiss the complaint cannot be sustained on the basis of the special com-mittee's non-responsive, pre-litigation reply to the plaintiff's demands.

Since the complaint makes no mention of the special com-mittee or its work after the meeting of October 8, 1996, the committee and its demand-refused letter have no further relevance to this action, which was filed on March 21, 1997, or to the outcome of this appeal.

*Third*, the decision in *Houle* v. *Low*, 407 Mass. 810 (1990), precludes the termination of this action even if (i) there was a majority of the board or committee that voted in favor of termination, (ii) that majority was independent and disinterested, and (iii) the Hancock defendants did not assist or participate either in the debate or the vote to terminate this action.[13]

*Houle* v. *Low*, *supra*, involved a closely held corporation where all directors but one were vulnerable to a conflict of interest claim. After a stockholder of the corporation filed a derivative action, the one director not named as a defendant in the suit was selected to be a special litigation committee of one person to evaluate and make a recommendation regarding the derivative action. The plaintiff appealed the trial court's allow-ance of the defendant's motion for summary judgment, and the Supreme Judicial Court reversed, holding that there was a genuine issue of fact as to whether the sole committee member was biased or lacked independence. The court continued its discussion of the subject on the supposition that upon subsequent hearing in the lower court, a judge might find the one person committee free of bias and independent. *Id.* at 823-824. Thus the court directed that upon remand, the corporation had the

---

[13]Hancock's attempt to distinguish *Houle* v. *Low*, *supra*, is without merit and requires no discussion.

burden of proof as to two issues: (i) whether the committee was independent and unbiased, and if so (ii) whether the committee, after thorough investigation, *id.* at 824, came to the conclusion that the corporation's best interest called for the termination of the derivative action and that this conclusion "was a reasonable and principled decision." *Id.* at 826. A "principled decision" includes, no doubt, a "good faith component" — a settled element of the business judgment rule as discussed *infra.*

The premise of the court's decision in *Houle* v. *Low, supra,* was the recognition of the obligation of the judicial system to deal fairly and competently with those seeking relief for wrongs done.[14] It will not do to construct a system which permits the foreclosure of relief merely at the request of those who are, or may be, in league with the wrongdoers, or at the request of those who choose to conceal the reasons that prompt the request, leaving an aroma of wrongdoing. Nevertheless, "the question whether a corporation should pursue a given lawsuit involves factors other than the merits of the claim. It is often a question of business policy . . . . 'It is not always best to insist on one's rights. . . .' [citation omitted] . . . . [T]he decision as to what is in the corporation's best interest is a matter of business judgment." *Id.* at 821. Moreover, there must be a range of director or senior officer decisions which, although falling short of full performance of the duty of care, may nevertheless be seen by an independent, informed observer as a decision which the director or senior officer in good faith reasonably believed was in the best interests of the corporation. See Principles of Corporate Governance, *supra* at § 4.01 (duty of care of directors and offices; business judgment rule).

*Houle* sought to resolve those conflicting concerns by acknowledging the power of a corporate representative to

---

[14]Although policyholders, unlike stockholders in a corporation, do not have an ownership interest that can be transferred to others, they nevertheless have a financial interest in the mutual insurance company. Policyholders are entitled to participate in the annual surplus of the company, which represents excess premiums or overcharges paid by the policyholders. See 18 Appleman, Insurance Law and Practice § 10060 (1945); 3 Couch, Insurance § 39:41 (3d ed. 1995); 43 Am. Jur. 2d Insurance § 74 (1982). See also *Clifford* v. *Metropolitan Life Ins. Co.*, 264 A.D. 168, 169 (N.Y. 1942). Because the surplus of a mutual insurance company belongs to its policyholders, a policyholder may sue on behalf of himself and all others similarly situated for a misapplication or misappropriation of such funds. *Ibid.* See discussion, *infra.*

terminate derivative litigation as a matter of sound business judgment, see *id.* at 825 n.10, but only if certain conditions were satisfied; in so doing, the court significantly expanded the content of the Massachusetts business judgment rule applicable to such board or committee decision.[15] First, each individual serving on the board or committee designated to make the decision[16] must be unbiased and independent — that is, lacking any "structural" or "inherent" bias in favor of the defendant member of the board upon which he or she sits. *Id.* at 815-816. Second, to ensure that the board or committee is acting for the corporation's best interest, the decision maker "must conduct a thorough and careful analysis regarding the plaintiff's suit," *id.* at 822, and express their conclusions in a "reasonable and principled decision."[17] *Id.* at 824. Finally, the trial judge, in

---

[15]*Houle* makes no mention of the business judgment rule, and the evidence calculated to support a board decision to terminate a derivative action necessarily differs from the evidence required to support the business decision of an individual officer or director. Compare *Houle* v. *Low*, *supra* at 825 n.10, and related text (describing the factors "which bear on the propriety, in a business sense, of pursuing the derivative suit"), with G. L. c. 156B, § 65 (describing when a "complete defense" is available for business decisions of individual directors and officers). Nevertheless, the rationale for both kinds of decisions have in common the "propriety, in the business sense," of such decisions. See 2 Principles of Corporate Governance, *supra* at § 7.10, for a description of events making the business judgment rule applicable to board or committee decisions to terminate derivative litigation.

[16]General Laws c. 156B, § 55, authorizes a business corporation to create committees of the board with all of the powers of the board (with exceptions not material to this appeal), including the power (if otherwise available) to terminate derivative actions, as mentioned in *Houle* v. *Low*, *supra*. General Laws c. 175, § 30(*a*)(3), expressly incorporates G. L. c. 156B, § 55, making the powers of a board of directors of a mutual insurance company coextensive with the powers of a board of a business corporation. Consequently, as in the case of a business corporation, the exercise of the power to terminate derivative litigation by a committee of the board of a mutual insurance company is governed by the same law as governs the board itself. See 2 Principles of Corporate Governance, *supra* at § 7.05, authorizing the board of a corporation to delegate its authority to terminate a derivative action by a motion to dismiss or a motion for summary judgment, and succeeding sections regarding the rules that govern such motions, which are applicable equally to the full board and to board committees.

[17]The Hancock defendants, citing *Aronson* v. *Lewis*, 473 A.2d 805, 812 (Del. 1984), press the argument that there is "a presumption that corporate decisions are unbiased, informed, and made in good faith." The judge adopted the same presumption. However, as we have indicated, *Houle* v. *Low*, *supra*, makes no mention of such a rule, preferring instead to allocate to the

reviewing the decision of the board or committee, shall determine whether, on the basis of the evidence presented, the committee reached a reasonable and principled decision, allowing due respect for a good faith, informed business decision. Compare *Grimes* v. *Donald*, 673 A.2d at 1217 (Delaware jurisprudence is designed to create a "balanced environment" which will deter baseless suits on the one hand, and on the other hand permit suit by a stockholder who is able to articulate particularized facts warranting relief).

Because neither the board nor the special committee has articulated a reasonable and principled decision regarding this litigation, there is no occasion to invoke the business judgment rule to protect either the board or the committee. See Principles of Corporate Governance, *supra* at § 4.01(c) comment c, at 174-176.

*Fourth*, the nub of the complaint against the Hancock defendants and Sawyer and Hathaway is the alleged entanglement of the defendants with the allegedly successful, but illegal, lobbying efforts of Sawyer. Since Hancock has acknowledged publicly that the lobbying activities of its government relations department had violated Massachusetts law, an important issue in the case appears to be whether the defendants' involvement with Sawyer, if any, was so purposeful and knowing that the defendants could not rationally have believed that that involvement, and Sawyer's illegal activities, were in the best interests of Hancock. See Principles of Corporate Governance, *supra* at § 4.01(c)(3) (an essential element of the business judgment rule is that the director or officer making the business decision "rationally believes that the business judgment is in the best interests of the corporation").

The Massachusetts business judgment rule applicable to individual business decisions of directors and officers is similar to the business judgment rule described in Principles of Corporate Governance, *supra* at § 4.01(c).[18] It is rooted in the idea that "action [by directors] taken *in good faith*, even though

corporation the burden of proving the absence of bias and that the corporate decision was reasonable and principled. *Id.* at 826.

[18]The business judgment rule of § 4.01(c) is available to a director or officer who makes a business judgment in good faith, is not interested in the subject matter of the judgment, is informed with respect to that subject, and rationally believes that the business judgment is in the best interest of the corporation.

wanting in sound judgment, does not involve them in personal liability" (emphasis added). *Sagalyn* v. *Meekins, Packard & Wheat, Inc.*, 290 Mass. 434, 438 (1935).[19] " 'Good faith' is . . . [not taken] to mean only the absence of subjective 'bad motives.' There is no reason to insulate an objectively irrational business decision — one so removed from the realm of reason that it should not be sustained — solely on the basis that it was made in subjective good faith." Principles of Corporate Governance, *supra* at § 4.01(c) comment f, at 181. "Absent some basis in reason, action could hardly be in good faith even apart from ulterior motive." *Ibid.*, quoting from *Sam Wong & Son* v. *New York Merc. Exch.*, 735 F.2d 653, 678 n.32 (2d Cir. 1984) (Friendly, J.). "The weight of authority and wise public policy favor barring from the safe harbor [of the business judgment rule] directors and officers who do not believe, or do not *rationally* believe, that their business judgments are in the best interests of the corporation" (emphasis original). Principles of Corporate Governance, *supra.* Thus, the business judgment rule, as traditionally conceived in Massachusetts, does not inexorably provide protection to the defendants individually if the allegations of the complaint are established.[20] See note 10, *supra.*[21]

b. *Hancock's argument regarding the indemnification of Hathaway and Sawyer.* Hancock also argues that dismissal of the complaint is required by article 9a of the Hancock by-laws,

---

[19]However, when the facts raise an issue of "personal advantage," *Sagalyn* v. *Meekins, Packard & Wheat, Inc.*, 290 Mass. at 438, or a conflict of interest, the burden is on the director to prove good faith. *Winchell* v. *Plywood Corp.*, 324 Mass. 171, 177 (1949).

[20]See also Principles of Corporate Governance, *supra* at § 4.01(a) comment d, at 150: "To be successful in a duty of care action involving noncompliance with law, a plaintiff is required to prove two violations: first, the plaintiff must establish a corporation's violation of the law, and second, the plaintiff must establish that the defendant director or officer failed to comply with the standards of § 4.01 with respect to the violation." Compare *Miller* v. *American Tel. & Tel.*, 507 F.2d 759, 762 (3d Cir. 1974), cited and quoted at *id.* ("[W]e are convinced that the business judgment rule cannot insulate the defendant directors from liability if they did in fact breach 18 U.S.C. § 610 [the statute prohibiting corporate campaign spending], as plaintiffs have charged").

[21]Whether, or to what extent, a board decision in compliance with *Houle* v. *Low*, *supra*, may cure business decisions of senior officers or board members which are not protected by the business judgment rule is not an issue presented by this case. See 2 Principles of Corporate Governance, *supra* at § 7.10(a)(2).

see note 5, *supra*, which requires the company to indemnify the directors and officers of Hancock for expenses incurred in defending any civil or criminal action. General Laws c. 175, § 30(*a*)(3), permits a Massachusetts mutual insurance corporation, such as Hancock, to avail itself of the provisions of § 67 of G. L. c. 156B, authorizing such indemnification to the extent provided therein, if it has a by-law provision to that effect "adopted by the [members]." The favorable vote required for adoption is not specified in G. L. c. 156B, § 67, and if it is a majority, whether the votes required are those of members present and voting at a meeting, or the votes of all members.

The copy of the by-laws in the defendants' supplemental appendix is inadequate on its face. There is no secretary's certificate attesting to a meeting of the *members* held following a legally sufficient notice of meeting and to the outcome of the vote that was taken. In this respect, we note that paragraph 27(d) of the complaint alleges that Hancock fails to send notice of the annual meeting to policyholders. However, G. L. c. 175, § 94, provides that policyholders are entitled to written notice of the annual meeting, and they are entitled to vote by proxy, as further provided in § 94. These are questions that cannot be resolved on a motion to dismiss, and the effect to be given to paragraph 9a of the by-laws must await further proceedings.[22]

c. *Hancock's argument regarding its by-law exculpatory provision.* Among the provisions of G. L. c. 156B which may be adopted by a mutual insurance company pursuant to c. 175, § 30(*a*)(4), as inserted by St. 1987, c. 634, is G. L. c. 156B, § 13(*b*)(1½). That section provides, inter alia, that the personal liability of a director for breach of fiduciary duty may be eliminated or limited except for breach of duty of loyalty (one of the plaintiff's claims in this case) and acts or omissions *not* in good faith or which involve intentional misconduct or a knowing violation of law. These provisions of G. L. c. 156B, § 13(*b*)(1½), may be included in a by-law of a mutual company

---

[22]An additional question is whether, as to Sawyer, there is an obligation to indemnify him at all, since it appears from the complaint that he was neither an officer nor a director of Hancock or of any subsidiary of Hancock, as required by paragraph 9a. (Paragraph 9a is more limited than the permitted scope of G. L. c. 156B, § 67). There is the further question whether Sawyer — as a result of his guilty plea described in the Appendix to this opinion — has been "finally adjudicated" not to have acted "in good faith in the reasonable belief that his actions were in the best interest of Hancock," that being an exception to the indemnification obligation. See Appendix.

.

pursuant to G. L. c. 175, § 30(*a*)(4), if such provisions are adopted by a two-thirds vote of those members *present and voting* at a meeting duly called for that purpose.[23] Paragraph 9a of the by-laws of Hancock, see note 5, *supra*, includes the substance of G. L. c. 156B, § 13(*b*)(1½). Hancock cites this by-law provision as grounds for the argument that the complaint must be dismissed as to all the defendant directors.

Again, the record contains no secretary's certificate as to whether this exculpatory provision in paragraph 9a was adopted as required by c. 175, § 39(*a*)(4), or the date the amendment was adopted. Nor is it self-evident that a director who is also a member (as each director is required to be under paragraph 5 of the by-laws) is qualified to vote in favor of this by-law amendment for his or her own benefit especially if, at the time of the vote, it was reasonably foreseeable that the director was exposed to liability.

Moreover, the benefit of the exculpatory clause in 9a is extended only to directors of Hancock, and Brown, Morton, D'Alessandro, and Hathaway are all alleged to be senior officers of Hancock as well as directors. To the extent that the claims against these defendants arise out of the alleged failure of their performance as officers and members of the management committee which is charged with responsibility of overseeing all the operations of Hancock — viz., their alleged approval and support of the unlawful activities of Sawyer — the exculpatory clause is not available to them. The fact that these defendants are also directors may be regarded as a mere happenstance.

The result is that neither the indemnification provision of paragraph 9a nor the exculpatory provisions of the same

---

[23]It is noteworthy that in the case of an ordinary business corporation, the exculpatory provision in c. 156B, § 13(*b*)(1½), is available only by an amendment to the articles of organization, which ordinarily requires a favorable vote of two-thirds of each class of stock *outstanding and entitled to vote*. See G. L. c. 156B, § 71.

Hancock's by-laws provide that merely ten policyholders (out of seven million policyholders) constitute a quorum for any meeting of Hancock. It is alleged that meetings of the members of Hancock are sparsely attended, and the exculpatory by-law provision could have been adopted by as few as eight policyholders present at the meeting. (Paragraph 12 of the by-laws provides that amendments "may be by a three-quarters vote," but it does not state whether the required vote is that of the policyholders or the board of directors, or whether the "three-quarters" vote is a fraction of outstanding votes or of persons present).

paragraph provides an adequate foundation to affirm the dismissal of this action on the complaint.

d. *Hancock's and Hathaway's arguments that the plaintiff's claims are time-barred.* These defendants argue that because Sawyer's illegal activities, as described in the complaint, terminated in May, 1993, the complaint, which was not filed until March 21, 1997, was barred by the three-year statute of limitations. There is no need, at this stage of the proceedings, to survey the field of when the statute of limitations begins to run in cases involving corporate fiduciaries. See *Demoulas* v. *Demoulas Super Markets, Inc.*, 424 Mass. at 517-524. It is enough to say that in stockholder derivative actions, the statute does not begin to run "until knowledge is gained by those who have the power and responsibility to act on the corporation's behalf and who are not themselves involved in the wrongdoing that is the basis for the cause of action." *Id.* at 522-523. None of these obvious questions of fact is resolved in the allegations of the complaint.

e. *Sawyer's argument, in which Hancock joins, that policyholders in a mutual insurance company have no right to bring a derivative action.* We respond to this argument summarily. As noted above, G. L. c. 175, § 30(*a*)(1), provides that the "general principles of law relative to the powers, duties and liabilities of corporations shall apply to all domestic companies." "Companies" is defined in § 1 of c. 175 to mean corporations engaged as principals in the business of insurance. An insurance company is formed as a corporation in accordance with designated provisions of G. L. c. 156B, see G. L. c. 175, § 49, and an insurance company must conduct its business in its corporate name, see G. L. c. 175, § 18. As noted above, numerous provisions of G. L. c. 156B are incorporated into G. L. c. 175, see §§ 30(*a*)(2) and 30(*a*)(3), and the term "stockholders" as it appears in the incorporated sections of G. L. c. 156B, means, in the case of a mutual company, "the members thereof."

The availability of a corporate derivative proceeding is settled law in Massachusetts; the proceeding may be regarded as a "general principle of law." See 2 Principles of Corporate Governance, supra, introductory note to derivative actions, at 4 ("Since at least the middle of the 19th century, it has been accepted in this country that the law should permit shareholders to sue derivatively on their corporation's behalf under appropriate conditions"). The earliest Massachusetts case of which we are

Harhen v. Brown.

aware is *Smith* v. *Hurd*, 12 Met. 371, 387 (1847). More recently, see *Bessette* v. *Bessette*, 385 Mass. 806, 809-810 (1982). Decisions elsewhere recognize the right of a policyholder in a mutual insurance company to bring a derivative action.[24]

An insurance company formed as a corporation in accordance with the provisions of G. L. c. 175 is a corporation and is subject to the provisions of G. L. c. 175, § 30(*a*), which includes derivative actions. We hold that the plaintiff, a policyholder in Hancock, has the right to bring this action.

f. *Sawyer's argument that a demand on all other policyholders is required*. The complaint does not allege that the demands set out in the plaintiff's twelve-page demand letter were made on Hancock's approximately seven million policyholders. The rule in Massachusetts is that when demand is refused by the directors, demand must be made upon the other shareholders, unless such a demand would be futile. *Pupecki* v. *James Madison Corp.*, 376 Mass. 212, 218 (1978). In Southgate & Glazer, Massachusetts Corporation Law & Practice, the authors note that Massachusetts is one of a minority of jurisdictions that continues to insist that demand on stockholders be made unless excused. *Id.* at § 15.7(d), at 475-476 (1999 Supp.). Neither Delaware nor New York, nor the Revised Model Business Corporation Act, requires a demand on stockholders, the authors note. See *id.* at n.133. The need for demand on stockholders is also eliminated in Principles of Corporate Governance, *supra* at § 7.03. In *Levitt* v. *Johnson*, 334 F.2d 815, 818 (1st Cir. 1964),

---

[24]We acknowledge the assistance of the plaintiff in bringing the following decisions to our attention: *Koster* v. *Lumberman's Mut. Cas. Co.*, 330 U.S. 518, 522 (1947) ("The stockholder's derivative action, to which this policyholder's action is analogous, is an invention of equity to supply the want of an adequate remedy at law to redress breaches of fiduciary duty by corporate managers"); *Stoner* v. *Walsh*, 772 F. Supp. 790, 795-796 (S.D.N.Y. 1991) (derivative suit by mutual insurance policyholders governed by State's general corporate law); *Elgin* v. *Alfa Corp.*, 598 So. 2d 807, 811 n.3 (Ala. 1992) ("It is undisputed that a policyholder in a mutual company can bring a derivative action on behalf of the mutual company"); *Lower* v. *Lanark Mut. Fire Ins. Co.*, 151 Ill. App. 3d 471 (1986) (mutual policyholder given same treatment as shareholder in derivative suit); *Rowen* v. *Le Mars Mut. Ins. Co.*, 282 N.W.2d 639 (Iowa 1979); *Matter of Prudential Ins. Co. Derivative Litigation*, 659 A.2d 961, 964-966 (N.J. Super. Ct. Ch. Div. 1995) (policyholders brought a derivative action against directors of Prudential Insurance Company, a mutual insurance company owned by its policyholders). See *Clifford* v. *Metropolitan Life Ins. Co.*, 264 A.D. at 170; *Shay* v. *Metropolitan Life Ins. Co.*, 172 Misc. 202 (N.Y. Sup. Ct. 1939), aff'd, 260 A.D. 958 (N.Y. 1940).

cert. denied, 379 U.S. 961 (1965), the court observed that for cases in which the number of stockholders was so large that demand upon them would either be "pointless or . . . impossibly burdensome," thereby excusing demand upon them.

In this case, the "impossibly burdensome" factor would apply not only to the serving of the demand upon millions of policyholders, but there is the more daunting possibility that several million policyholders would reply offering their advice and suggestions.

We conclude that, in the circumstances of this case, demand upon all policyholders was excused.

5. *Conclusion.* For all the foregoing reasons, the final judgment dismissing the complaint is reversed, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

APPENDIX.

From the supplemental appendix filed by Hancock, it appears that Sawyer was tried in the United States District Court for the District of Massachusetts, and convicted of twenty-eight counts of mail and wire fraud, and conspiring to deprive taxpayers of legislators' honest services. Sawyer's conviction and one-year sentence were vacated on appeal for errors in instructions to the jury. At the end of 1996, Sawyer pled guilty to a one-count information charging him with mail fraud, the original indictment to be dismissed. The assistant United States attorney described the facts underlying the indictment: "[T]he defendant was a lobbyist for John Hancock in all matters pending before the Massachusetts Legislature. From 1986 through 1993, the defendant gave illegal gratuities in the form of free golf and other entertainment to Massachusetts Legislators including Francis H. Woodward who served as house chair of the Joint Committee on Insurance from 1985 through 1990. These illegal gratuities form the basis of the charge in Count 1 of the information . . . . The mailing consists of a letter and a check from the defendant to an individual for payment of the golf and other entertainment . . . ." The judge found "that there is an independent basis in fact for accepting the plea and [the court] therefore accept[s] the plea of guilty and order[s] that it be entered." Sawyer, in response to the judge's inquiry, said, "I'm sorry for the mistakes which I have made. . . ." The judge responded by putting some "remarks on the record." The remarks described the judge's unfavorable opinion about the Federal prosecution of the crime charged. At the conclusion of those remarks the judge imposed a sentence of one-year probation, a fine of $5,000, and a $50 special assessment.

The judge then said, "[O]ne other matter needs to be — I find that the guilty plea is not an adjudication of a question of defendant's good faith in

acting in the best interest of John Hancock. The statement that I have just read is to be filed and made a part of the record in this case." This statement appears to relate to the language of paragraph 9a of the Hancock by-laws (discussed in the text, *supra*), which permits the indemnification of an employee of a corporation for expenses incurred in any civil or criminal proceeding unless there has been an adjudication that the employee did *not* act in good faith in the belief his action was in the best interest of the corporation. We take the judge's statement to mean that he was *not* making a finding either as to the good faith or the bad faith of Sawyer.

On February 10, 1997, the board of directors of Hancock voted to indemnify Sawyer for his legal fees and costs incurred in connection with the Federal criminal charges which were dismissed as part of Sawyer's plea agreement, but not the fees and costs incurred in defense of the charge to which he pleaded guilty.