Gants, J.
Background
Founded in 1912, the defendant, Liberty Mutual Insurance Company (“Liberty”), is a mutual insurance company whose core business is property and casualty insurance. With roughly 750,000 policyholders, Liberty is the seventh largest property and casualty insurance company in the United States, with $4.6 billion of net written premiums in 2000. As a mutual insurance company, as opposed to a stock insurance company, Liberty presently issues no stock and has no shareholders. For all practical purposes, its policyholders have the equity rights that shareholders have in a stock corporation — its policyholders elect directors, vote directly on changes in the articles of organization, have the right to receive distributions of surplus in the unlikely event of a dissolution or liquidation, and enjoy the right to receive dividends or refunds of premiums if deemed warranted in the opinion of the Board of Directors. Similarly, just as a stock corporation exists to benefit its shareholders, a mutual insurance company exists to benefit its policyholders. The theory of mutuality is to align the interests of policyholders as owners with their interests as insurance customers by providing policyholders with an incentive to prevent injuries and minimize losses so as to keep premiums low and permit the insurance company’s surplus to remain high enough to warrant policyholder dividends or refunds of premium. Consequently, while a person who purchases an insurance policy from a stock insurance company is buying only a contract right in that insurance policy, a person who purchases an insurance policy from a mutual insurance company is buying both a contract right in that policy and an equity right in the company (what another mutual insurance company used to refer to as “a piece of the Rock”).
On September 13, 2000, Liberty’s Board of Directors unanimously approved a Plan of Reorganization as part of an anticipated Global Transaction. Under this Plan of Reorganization, Liberty will cease to be a mutual insurance company and will become a stock insurance company (which I shall refer to as “Reorganized Liberty"). Before reorganizing, Liberty will form three companies:
Liberty Mutual Holding Company, a Massachusetts mutual holding company (“Liberty Mutual Holding”);
LMHC Massachusetts Holdings Inc., a Massachusetts stock holding company (“LMHC Massachusetts Holdings”); and
Liberty Mutual Group, Inc., a Massachusetts stock holding company (“Liberty Mutual Group”).
None of these companies will be engaged in the business of insurance; that will continue to be done only by Reorganized Liberty. Initially, Liberty Mutual Holding will own 100 percent of the voting stock of LMHC Massachusetts Holdings, which will own 100 percent of the voting stock of Liberty Mutual Group, which will own 100 percent of the voting stock of Reorganized Liberty, so that Reorganized Liberty will be a direct, wholly-owned subsidiary of Liberty Mutual Group. Each of the three stock companies — LMHC Massachusetts Holdings, Liberty Mutual Group, and Reorganized Liberty — may in the future sell stock in their respective companies but Liberty Mutual Holding will continue to retain, directly or indirectly, at least 51 percent of the voting stock of Reorganized Liberty.[1] Therefore, Liberty Mutual Holding shall continue to maintain majority voting control of Reorganized Liberty.
The Plan of Reorganization will have no impact on the contract rights of current Liberty policyholders— whatever insurance policies that are now in effect will remain in effect unchanged. However, it will extinguish all equity rights that existing policyholders have in Liberty, and replace those extinguished rights with new equity rights in Liberty Mutual Holding. Liberty policyholders will receive no consideration for their extinguished equity rights in Liberty apart from their new equity rights in Liberty Mutual Holding.
This Plan of Reorganization is an integral part of an anticipated Global Transaction in which two other mutual property and casualty insurance companies affiliated with Liberty — Employers Insurance of Wausau (“Wausau”) and Liberty Mutual Fire Insurance Company (“Liberty Fire”) — will engage in similar reorganizations to stock insurance companies under the common ownership of Liberty Mutual Holding. If the Global Transaction were to be completed, every policyholder of Liberty, Wausau, and Liberty Fire will have equity rights in Liberty Mutual Holding, which will retain majority voting control of the Reorganized Liberty, Reorganized Wausau, and Reorganized Liberty Fire.
In short, under the Plan of Reorganization, Liberty policyholders will trade their equity rights in Liberty for equity rights in Liberty Mutual Holding, the mutual holding company which shall retain majority control over the Reorganized Liberty, and, if the Global Transaction were to proceed as planned, over Reorganized Wausau and Reorganized Liberty Fire as well. The Plan of Reorganization, to become effective, must be ap *305 proved by at least two-thirds of voting Liberty policyholders. For all practical purposes, Liberty policyholders must decide whether, given the totality of circumstances, this is a fair trade for them.
On June 28, 2001, the plaintiffs, each of whom own an insurance policy issued by Liberty, filed suit in this Court against Liberty on behalf of themselves and the class of persons who own Liberty policies. Thev allege essentially that Liberty, by printing and planning to distribute to all policyholders its Policyholder Information Statement Relating to Proposed Plan of Reorgani-. zation, dated June 13, 2001 (“the Proxy Statement”) and the accompanying 12-page Policyholder Guide[2] will through false statements and omissions of material facts be misleading Liberty policyholders into trading their equity rights in Liberty for equity rights in Liberty Mutual Holding that are worth far less, Stripped to its essence, the plaintiffs allege that, unless this Court intervenes, the policyholder vote on the Plan of Reorganization will be fatally tainted and fundamentally unfair because Liberty policyholders will not understand from these documents how bad a deal this is for them.[3]
The plaintiffs have moved for a preliminary injunction enjoining Liberty from distributing the Proxy Statement and Policyholder Guide to policyholders without making substantial revisions necessary to provide fair and adequate disclosure to its policyholders. Liberty vigorously opposes the motion for a preliminary injunction. In addition, Liberty has moved to dismiss the complaint. This Court will first address the motion to dismiss, since the granting of that motion would obviate the need even to consider the motion for preliminary injunction.
Motion to Dismiss
Liberty has moved to dismiss the complaint for failure to state a claim under Mass.R.Civ.P. 12(b)(6). When evaluating the sufficiency of a complaint, this Court must accept as true the factual allegations of the complaint and all reasonable inferences favorable to the plaintiffs which can be drawn from those allegations. Fairneny v. Savogran, 422 Mass. 469, 470 (1996); Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 429 (1991). The issue is whether the facts alleged, generously construed in favor of the plaintiffs, state a valid legal claim that would warrant relief on any theory of law. Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 89 (1979). Viewed in that permissive light, Liberty’s motion to dismiss must be denied.
Liberty makes four arguments in support of its motion to dismiss.[4] First, Liberty contends that this complaint is barred as premature under the Massachusetts Holding Company Act, G.L.c. 175, §§19F-19W (“the Holding Company Act”), which provides that “actions concerning any plan of reorganization ... or any acts taken or proposed to be taken under this section, shall be commenced within one year after the plan of reorganization ... is filed with the commissioner . . .” G.L.c. 175, §19L(a). Second, Liberty contends that this Court, under the doctrine of primary jurisdiction, should decline to exercise jurisdiction in this matter because it is within the special competence dle Commissioner of Insurance and there remains possibility of further administrative action. Third, Liberty argues that the fraud count in the complaint is n°t plea<3ed with the required particularity, and fails t0 make necessary allegations. Fourth, Liberty contends that it cannot be found in breach of any fiduciary dutF because it has no fiduciary duty to its policyholders- This Court ^11 address each argument in turn, However, before doing so, it is necessary first to understand what must happen before Liberty s Plan of Reorganization can become effective,
Under G.L.c. 175, §19H, there are six steps that must be accomplished for the Plan of Reorganization to become effective:
1. The Plan of Reorganization must be approved by a three-fourths majority of Liberty’s Board of Directors. G.L.c. 175, §19H(a)(l). This approval has already been received; the Board unanimously approved the Plan of Reorganization, as amended, on June 13, 2001.
2. The Massachusetts Commissioner of Insurance (“the Commissioner”) must “approve” for mailing to all policyholders the Plan of Reorganization “or a summary thereof . . . and such other explanatory information as the Commissioner shall approve or require.” G.L.c. 175, §19H(c). This approval has also been accomplished; the Commissioner on July 2. 2001 approved for mailing to all policyholders Liberty’s Proxy Statement and Policyholder Guide, which policyholders are asked to read first.
3. At least 60 days after the mailing of the Plan and accompanying materials to Liberty policyholders, the Commissioner must hold a public hearing “upon the fairness of the terms and conditions of the plan of reorganization, the reasons and purposes for the reorganization of the mutual insurer, and whether the reorganization is in the best interest of said mutual insurer and is fair and equitable to its policyholders, and not detrimental to the insuring public.” G.L.c. 175, §19H(c). This public hearing is currently scheduled for October 10, 2001.
4. At least 30 days after the public hearing, a meeting for all policyholders must be conducted to vote on the Plan of Reorganization. Two-thirds of voting Liberty policyholders must approve the Plan. This policyholders’ meeting and vote is currently scheduled for November 9, 2001. Policyholders may vote by written ballot in person, by a proxy agent appointed by the policyholder, or by mail. G.L.c. 175, §19H(a)(3) and (e).
5. Within 60 days of the public hearing, the Commissioner must approve the Plan of Reorganization, *306 based on her finding, inter alia, that “the proposed reorganization is in the best interests of the reorganizing insurer; the plan is fair and equitable to the reorganized insurer’s policyholders; the plan provides for the enhancement of the operations of the reorganizing insurer; [and] the plan will not substantially lessen competition in any line of insurance business . . .” G.L.c. 175, §19H(d).
6. The Plan of Reorganization must be filed with the Commissioner, who must then issue a new certificate of authority to the reorganized insurer for.filing with the Massachusetts Secretary of State. G.L.c. 175, §§19H(a)(4), 19K. The Plan of Reorganization becomes effective upon the filing of the articles of organization of the mutual holding company and the amended articles of organization of the reorganized insurer with the Secretary of State. Id. The issuance by the Commissioner of a new certificate of authority and the filing with the Secretary of State, in contrast with the other five steps, are simply administrative requirements.
1. Is the Complaint Premature Under G.L.c. 175, §19L(a)?
G.L.c. 175, § 19L(a) provides that “(n)otwithstanding any general or special law to the contrary and except as otherwise provided in subsections (c) and (d), actions concerning any plan of reorganization ... or any acts taken or proposed to be taken under this section, shall be commenced within one year after the plan of reorganization ... is filed with the commissioner ...” Liberty contends that this provision not only sets a statute of limitation but also bars any action regarding a plan of reorganization until after the plan of reorganization is filed with the Commissioner, the sixth and final step in the approval process. Since there is no dispute that this step has yet to occur, Liberty contends that this action is premature and may not be brought.
This Court takes a different view of this statute. In the absence of this statute, judicial review of the decision of the Commissioner of Insurance would be governed solely by G.L.c. 30A, §14, which provides that an action seeking judicial review of an agency decision must be commenced in the Superior Court “within thirty days after receipt of notice of the final decision of the agency . . .” G.L.c. 30A, §14(1). The preliminary phrase in G.L.c. 175, §19L(a)— "[notwithstanding any general or special law to the contrary" — reflects that the Legislature intended to give those persons aggrieved by the Commissioner’s final decision one year to bring such claims, not the thirty days otherwise provided for under G.L.c. 30A, § 14. In addition, perhaps recognizing that it may not be clear in the context of the Holding Company Act when the Commissioner’s “final decision” has taken place, this statute sets a firm date for starting the one-year limitations time clock — the date of filing with the Commissioner. Therefore, this Court understands that the Legislature, in enacting G.L.c. 175, §19L(a), intended to set a longer, better defined limitations period for the filing of lawsuits seeking judicial review of the Commissioner’s final decision under the Holding Company Act than for other agency decisions. The Legislature did not, through this statute, intend to bar all civil actions (including those, like here, alleging only common law claims) that have anything to do with a proposed plan of reorganization until after the plan had been filed with the Commissioner. Indeed, there is nothing in the Holding Company Act that indicates that the Legislature even contemplated that lawsuits would be brought regarding a plan of reorganization except to challenge the merits of an approved plan.
Moreover, it is important to remember that the plaintiffs here are not seeking judicial review of the Commissioner’s approval of the Proxy Statement and Policyholder Guide, perhaps because G.L.c. 175, §19H(d) does not provide any legislative guidance as to what standard the Commissioner should use before approving the distribution of such documents. Rather, the complaint alleges only that Liberty is breaching its obligations under the common law by distributing a misleading Proxy Statement and Policyholder Guide for the purpose of inducing its policyholders to surrender their equity rights in Liberty in return for inferior equity rights in Liberty Mutual Holding. Therefore, even if this Court were to read G.L.c. 175, §19L(a) to bar a civil action under the Holding Company Act until after the Commissioner had approved the plan of reorganization, it would not bar this civil action, since it is not brought under the Holding Company Act and seeks no relief under that Act.
For all these reasons, dismissal is not warranted on this ground.
2. Should This Court Decline Jurisdiction Under the Doctrine of Primary Jurisdiction?
Liberty contends that this Court, under the doctrine of primary jurisdiction, should decline to exercise jurisdiction in this matter because it is within the special competence of the Commissioner of Insurance and there remains the possibility of further administrative action. The doctrine of primary jurisdiction is properly invoked when a court is asked to intervene in an administrative matter within the special competence of an agency when final action has not yet been taken, so there remains the possibility of further administrative action. See Reliance Insurance Company v. Commissioner of Insurance, 31 Mass.App.Ct. 581 (1991). In such cases, the more prudent course is to defer judicial review until the agency has had the opportunity to apply its expertise and reach a final decision, thereby preserving the integrity of the administrative process and sparing the judiciary the burden of conducting piecemeal review of administrative matters. Id. at 584, citing Leahy v. Local 1526, Am. Fedn. of State, County, & Mun. Employees, 399 Mass. 341 (1987).
*307 The doctrine of primary jurisdiction does not apply to this case for two reasons. First, this Court is not being asked to review the Commissioner’s approval of the Proxy Statement and Policyholder Guide; it is being asked to conduct its own review to ensure compliance with Liberty’s common law obligations. Second, to the extent that this Court is reviewing a Proxy Statement and Policyholder Guide that has been reviewed by the Commissioner under G.L.c. 175, §19H(d), the Commissioner’s review has been completed, with written approval for printing and distribution having been provided on July 2, 2001. There is no reasonable possibility that the Commissioner will take any further action regarding either the Proxy Statement or the Policyholder Guide. Thus, even if prudence would dictate deferring any judicial review of the Proxy Statement or the Policyholder Guide under the common law until the Commissioner had completed her review, that review has already been completed and final approval given.
3. Is the Fraud Claim Insufficiently Pleaded?
Count One alleges, in essence, that Liberty has knowingly prepared a Proxy Statement that makes material misrepresentations and omits material information which, unless enjoined by the Court, will reasonably be relied upon by policyholders and taint their vote regarding the Plan of Reorganization. Stated differently, the plaintiffs contend that Liberty is fraudulently inducing its policyholders to surrender their equity rights in Liberty based on false and misleading information regarding the proposed Plan of Reorganization. The specific misrepresentations and omissions are carefully outlined in the complaint. The complaint more than adequately alleges, that a fraud is in progress, and provides Liberty with more than sufficient information to understand what misrepresentations and omissions are alleged.
4. Does Liberty Have a Fiduciary Duty to Its Policyholders?
Liberty contends that the relationship between an insured and insurer is purely contractual, and that it has no fiduciary duty to its policyholders. It may indeed be true that the relationship between a stock insurance company and its insured is purely contractual. It may also be true that, with respect to matters concerning the contractual rights of insureds in a mutual insurance company, the mutual insurance company has no fiduciary duty to its insured. However, this Court does not accept that, with respect to disclosures made to policyholders in a mutual insurance company asking them to surrender their equity rights, the mutual insurance company has no fiduciary duty to its policyholders. This Court need not decide, for purposes of this motion to dismiss, the precise scope of the fiduciary duty that a mutual insurance company owes to policyholders. Given the allegations of the complaint, it is sufficient here for that fiduciary duty to be simply a duty to act in good faith to ensure that policyholders, when asked to vote on a proposal that will extinguish their equity rights, are provided with accurate and adequate information on which to base their vote. At the hearing on this motion, Liberty’s counsel acknowledged that Liberty owed such a duty to its policyholders.[5]
For all these reasons, Liberty’s motion to dismiss must be denied. As a result, since the complaint survives this motion, this Court must consider the plaintiffs’ motion for a preliminary injunction.
Motion for Preliminary Injunction
The gist of the plaintiffs’ complaint is that the Proxy Statement and Policyholder Guide contain factual misrepresentations and omit material facts that a reasonable policyholder would consider important in deciding whether or not to approve the Reorganization Plan. The plaintiffs contend that, if policyholders are asked to tender their votes on the Reorganization Plan based on this misinformation, the integrity of the vote will be fatally tainted. Stated bluntly, the plaintiffs argue that, unless the Court enjoins the dissemination of the Proxy Statement and Policyholder Guide, Liberty policyholders will be hoodwinked into approving a Reorganization Plan in which they will lose far more than they will gain.
It is important to reiterate that this complaint is not now alleging that the Plan of Reorganization is unfair or inequitable to Liberty’s policyholders. This Court certainly understands that plaintiffs believe that it is both unfair and inequitable, but that determination has yet to be made by the Commissioner under G.L.c. 175, §19H(d) after a public hearing, and therefore is not ripe for judicial review. The issue presented by this complaint, then, is not whether the Plan itself is substantively fair or unfair to policyholders. Rather, the issue is whether the information provided to policyholders by Liberty is sufficiently fair and accurate to permit them to make an informed decision as to whether or not to approve the Plan.
In determining whether to grant a preliminary injunction, this Court must apply the three-part balancing test articulated in Packaging Industries Group, Inc. v. Cheney, 380 Mass. 609, 616-17 (1980). First, the court must evaluate the moving party’s claim of injury and its likelihood of success on the merits. Id. at 617. Second, it must determine whether failing to issue a preliminary injunction would subject the moving party to irreparable injury — losses that cannot be repaired or adequately compensated upon final judgment. Id. at 617 & n. 11. Third, “(i]f the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party.” Id. at 617. In balancing these factors, “(w]hat matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of *308 such harm in light of the party’s chance of success on the merits. Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue.” Id. In an appropriate case, “the risk of harm to the public interest also may be considered.” Brookline v. Goldstein, 388 Mass. 443, 447 (1983).
In considering the factors that comprise this balancing test, it becomes plain that the plaintiffs, for five reasons, must jump an extraordinarily high hurdle to persuade this Court literally to stop the presses and enjoin Liberty from distributing its Proxy Statement and Policyholder Guide to policyholders as planned. First, the Legislature, under the Holding Company Act, granted to the Commissioner of Insurance the responsibility to approve the Proxy Statement, the Policyholder Guide, and all “other explanatory information” before such materials can be mailed to policyholders. In addition, the Legislature authorized the Commissioner under the Act to “supervise and direct and prescribe the rules governing the procedure for the conduct of voting on the proposal to such extent ... as [she] deems necessary to insure a fair and accurate vote.” G.L.c. 175, §19H(e). Her powers include the “power to supervise and regulate . . . the giving of notice of the proposal ...” Id. Pursuant to these responsibilities, the Commissioner approved on July 2, 2001 the distribution of the Proxy Statement and Policyholder Guide. While the Act does not provide guidance as to what standard the Commissioner must use in approving the Proxy Statement and Policyholder Guide for distribution, this Court presumes that the Commissioner considered to some extent whether they fairly and accurately describe the proposed Reorganization to Liberty policyholders. The Commissioner did not conduct this review in a vacuum; she was assisted by advisors retained from two respected law firms, a respected investment bank, and a respected major accounting firm. While the plaintiffs do not ask this Court directly to review the Commissioner’s decision to approve these materials for distribution, this Court is mindful of the fact that the plaintiffs, through their motion for a preliminary injunction, are asking this Court to enjoin the distribution of materials that the Commissioner has approved for distribution.
Second, in justifiable reliance on the Commissioner’s approval of the distribution of these materials, Liberty has already started in motion the expensive process of printing roughly 2.8 million Proxy Statements and Policyholder Guides, and preparing them for distribution.[6] Since the public hearing is currently scheduled for October 10, 2001, and since, as a matter of law, these materials must be mailed to policyholders no later than 60 days before that hearing, the mailing of these materials must be completed no later than August 11,2001. Liberty has made plans to commence the mailing on July 13, 2001. Liberty estimates that the cost of printing these materials is $4 million, and that any court-ordered changes in the Proxy Statement and Policyholder Guide would cost Liberty at least that much.
Third, although a preliminary draft of Liberty’s Proxy Statement has been available on the Division of Insurance’s website since December 2000, the plaintiffs did not bring this action until June 28, 2001, just four days before the Commissioner’s final approval of the Proxy Statement and Policyholder Guide for distribution and only 15 days before Liberty plans to begin mailing these materials to policyholders. In fairness to the plaintiffs, it is likely that, if the plaintiffs had filed their complaint earlier, the doctrine of primary jurisdiction would have precluded judicial consideration of any motion for preliminary injunction until the Commissioner had completed her review and approved final documents for mailing. Yet, the fact of the matter is that the timing of the filing gives this Court precious little time to consider the motion for preliminary injunction before the mailing is scheduled to begin.
Fourth, if the motion for preliminary injunction were denied and the policyholders approved the Plan based on what the plaintiffs contend are deceptive and misleading representations in both the Proxy Statement and Policyholder Guide, the plaintiffs could still proceed with this action and ask this Court for a permanent injunction declaring the vote null and void, and ordering Liberty to revise the Proxy Statement and Policyholder Guide, submit the revised materials to policyholders, and conduct a new vote. See Butler v. Provident Mutual Life Insurance Company, Civil No. 9901-0780 (Court of Common Pleas of Pennsylvania, Sept. 17, 1999).
Fifth, perhaps for the above reasons, the plaintiffs cannot point to a single judicial precedent in which a court, under these circumstances, has issued a preliminary injunction enjoining the printing and dissemination of a proxy statement until revisions are made to that statement.
In view of these five reasons to deny the motion for preliminary injunction, the plaintiffs, to prevail on this motion, essentially must demonstrate that the Proxy Statement and Policyholder Guide so fundamentally mislead policyholders regarding the Reorganization Plan that any vote regarding the Plan will almost certainly be deemed null and void. This is admittedly a difficult standard for the plaintiffs to meet, especially at this stage of the case, without the benefit of discovery.
While the plaintiffs allege numerous false and misleading statements in the Proxy Statement and Policyholder Guide, their allegations ultimately come down to four fundamental claims. First, the plaintiffs contend that the Proxy Statement and Policyholder Guide fail adequately to inform policyholders that, when they trade their equity rights in Liberty for equity rights in Liberty Mutual Holding, they will no longer receive any of the dividends they have historically received as holders of equity rights in Liberty. Second, the plain *309 tiffs contend that the Proxy Statement and Policyholder Guide fail to inform policyholders that, as a result of the conflict of interest between policyholders and future shareholders, they will likely receive less in contract dividends from Reorganized Liberty. Third, the plaintiffs claim that the Proxy Statement and Policyholder Guide fail to reveal that policyholders would fare much better in a demutualization plan than in the proposed Reorganization Plan. Fourth, the plaintiffs contend that the Proxy Statement and Policyholder Guide fail adequately to warn Liberty policyholders that the Global Transaction will seriously dilute their voting power in Liberty Mutual Holding, and essentially cede control over this parent company to policyholders in Reorganized Liberty Fire. This Court will address each of these four arguments in turn.
1. Do the Proxy Statement and Policyholder Guide Jail adequately to inform policyholders that, when they trade their equity rights in Liberty for equity rights in Liberty Mutual Holding, they will no longer receive any of the dividends they have historically received as holders of equity rights in Liberty?
Under Article 13 of Liberty’s By-laws, the Board of Directors may vote “such dividends or refunds . . ., at such rates, in such amounts and subject to such conditions” that “in the opinion of the Board ... is warranted.”[7] While the decision as to whether to vote dividends to policyholders and in what amount rests entirely in the discretion of the Board, the limited evidentiary record in this motion for preliminary injunction reflects that the Board each year has voted such dividends for its policyholders. Between 1968 and 1977, the Board paid dividends to policyholders each year in amounts ranging from $59 million to $100 million, averaging $77.6 million per year over this ten-year period. The Court has no data for the period from 1977-1985. Between 1986 and 1988, considerable dividends were declared to policyholders for each of these three years, ranging from a low of $206 million in 1986 to a high of $357 million in 1988. The Court has no data for the period from 1989-1995, but has the table for Five Year Historical Data in Liberty’s Annual Statement for fiscal (and calendar) year 2000, which reflects that dividends were paid to policyholders in each of the past five years. According to that table, Liberty paid dividends to policyholders in each of the last five years, ranging from a low of $24.6 million in 1998 to a high of $77.2 million in 1996, with an average over the five-year period of $52.9 million.
The Proxy Statement makes clear that, now, each Liberty policyholder has contract rights under the insurance policy and equity rights in Liberty as a mutual insurer. The Proxy Statement also makes clear that, under the Reorganization, Liberty policyholders will retain their contract rights under the insurance policy to be held by Reorganized Liberty, but will surrender their equity rights in Liberty and receive in return equity rights in Liberty Mutual Holding.
What is far less clear from the Proxy Statement is that policyholder dividends may be declared by the Board either as a contract right under the terms and provisions of some Liberty insurance policies or as an equity right. See Proxy Statement at 3 (Glossary) and 15. To the extent that dividends derive from contract rights set forth in some insurance policies, the Proxy Statement consistently declares that Reorganization will have no effect on the policies and practices that govern payment of these dividends. See Proxy Statement at 15, 35.
To the extent that dividends derive from equity rights as policyholders in a mutual insurance company, the Proxy Statement makes what appears to be two conflicting assertions. On page 16 of the Proxy Statement, in a table entitled “Impact of the Reorganization and Global Transaction on Contract Rights and Equity Rights of Policyholders,” Liberty recognizes that among the equity rights of Liberty policyholders is the right, as members of Liberty, “to dividends as, if and when declared by the Board of Directors of [Liberty].” According to the table, the impact of the Reorganization will be that “Policyholders, as Members, have the right to dividends as, if and when declared by the board of directors of Liberty Mutual Holding Company.” Id. The impact after the Global Transaction, according to the table, is the same as after the Reorganization, except that the policyholders of Reorganized Wausau and Reorganized Liberty Fire will also have the right to dividends as, if and when declared by the board of directors of Liberty Mutual Holding Company. From this table, a policyholder reasonably could infer that, under the Reorganization, he will receive dividends through his equity rights in Liberty Mutual Holding much as he has in the past received dividends through his equity rights in Liberty. Indeed, on page 12 of the Proxy Statement, in bold print, Liberty declares, “[Liberty’s] current policies with respect to dividends to Policyholders will not be affected by the Reorganization.” (Emphasis in original.)[8]
However, on page 36 of the Proxy Statement, in the last paragraph of a section entitled “Equity Rights,” Liberty declares, “Liberty Mutual Holding Company has no current plans to pay dividends or make any other type of distributions to its Members following the Reorganization.” On page 56, buried in a section entitled “Certain Japanese Income Tax Consequences of the Reorganization, the MHC Merger and the LMFIC Merger," the Proxy Statement declares in a sub-section regarding the Reorganization:
The amount of taxable gains or losses, if any would be calculated as the difference between the fair market value of Equity Rights in Liberty Mutual Holding Company and the tax base of Equity Rights *310 of [Liberty]. For most of the Japanese Members, the tax base of Equity Rights of [Liberty] will be zero. It would be expected, however, that the fair market value of Equity Rights in Liberty Mutual Holding Company would be de minimis, if not zero (for purposes of Japanese Income Tax Laws), in light of the non-transferability, the temporary nature (i.e. Equity Rights will continue only so far as the Policy from which such rights are derived remains in Force), and Liberty Mutual Holding Company’s plan to pay no dividends or any other distributions to its Members following the Reorganization.
(Emphasis added.)
At the hearing on the motion for preliminary injunction, Liberty argued that what may appear to be conflicting assertions regarding equity rights are indeed entirely consistent. The reason is that the General Counsel of Liberty attests that Liberty, in its entire history, has not paid a penny of equity rights dividends to policyholders, so it is consistent to say both that Liberty policyholders will enjoy the same right to equity dividends as members of Liberty Mutual Holding and that Liberty Mutual Holding plans to pay no dividends to Liberty policyholders. In short, Liberty contends that it never paid any equity dividends in the past and that Liberty Mutual Holding does not intend to in the future, so its policyholders will effectively be in the same position with respect to equity dividends after the Reorganization as they were before, i.e. they will not receive any.
Nowhere in either the Proxy Statement or the Policyholder Guide does Liberty tell its policyholders that they never have received equity dividends, and that the hundreds of millions of dollars that Liberty has paid its policyholders as dividends over the years was paid as a contract right and not as an equity right. The accuracy of this assertion, which the plaintiffs vigorously dispute but cannot now disprove, is critical to any policyholder’s evaluation of the fairness of the Reorganization Plan because, under that Plan, Liberty policyholders will be trading their equity rights in Liberty for equity rights in Liberty Mutual Holding, which will pay no dividends. This trade maybe acceptable if policyholders’ equity rights in Liberty never yielded any dividends, but it would certainly not be acceptable to most policyholders if the equity rights they are being asked to trade had yielded millions of dollars in dividends over the years.
If indeed it is true, as Liberty attests, that Liberty paid all dividends under its policyholders’ contract rights and never under their equity rights, then the Proxy Statement and Policyholder Guide do not so fundamentally mislead policyholders as to warrant a preliminary injunction. If, however, it emerges through additional discovery that Liberty did indeed pay dividends under its policyholders’ equity rights, then Liberty would have an uphill battle persuading this Court that the vote should remain valid, because the assertions buried on pages 36 and 56 of the Proxy Statement, in the context of the Statement as a whole, fail to provide adequate notice to policyholders that they will likely receive no dividends from Liberty Mutual Holding. Burying these assertions may not matter if the equity rights in Liberty that policyholders are trading historically generated no dividends, but it would certainly matter if Liberty policyholders were misled into trading equity rights in Liberty that yielded dividends for equity rights in Liberty Mutual Holding that will not.
2. Do the Proxy Statement and Policyholder Guide fail to inform policyholders that, as a result of the conflict of interest between policyholders and future shareholders, they will likely receive less in dividends from Reorganized Liberty?
The plaintiffs properly observe that, if Liberty remains a.mutual insurer, with no shareholders, only policyholders may receive dividends from Liberty’s surplus. In deciding whether to issue dividends and the amount of such dividends, Liberty’s Board presently has a fiduciary duty only to its policyholders and need consider only their interests. However, if the Reorganization Plan were to become effective, Reorganized Liberty would become a stock corporation and, once it issued stock, may pay dividends from its surplus to both its policyholders and its shareholders. Moreover, in deciding whether to issue dividends and the amount of such dividends, Reorganized Liberty’s Board of Directors, although controlled indirectly by Liberty Mutual Holding, would have a duty to protect its minority shareholders, and must consider their interests whenever it considered issuing a dividend to policyholders. See generally Donahue v. Rodd Electrotype Co. of New England, Inc., 367 Mass. 578, 593-594 & n.20 (1975). Finally, to maximize share values, a stock insurance company has an incentive, to the extent consistent with competition, to maximize premiums and minimize policyholder dividends; a mutual insurance company has precisely the opposite incentive. Stated differently, a stock insurance company has an incentive to pay as little in policyholder dividends as it can while remaining competitive; a mutual insurance company has an incentive to pay as much in policyholder dividends as it can, consistent with its need to maintain an adequate surplus. For all these reasons, the plaintiffs contend that the Reorganization will likely result in a significant reduction in the amount paid in policyholder dividends. Indeed, the plaintiffs argue that the likely reduction in the amount paid in dividends will be even greater if, as Liberty contends, all dividends are presently paid pursuant to contract rights rather than equity rights. If all dividends are paid under contract rights, then under the Reorganization all the dividends that policyholders will receive will come from Reorganized Liberty, a stock corporation, and none will come from Liberty Mutual *311 Holding, the mutual holding company that will be comprised solely of policyholders.
The plaintiffs’ contention that the Reorganization, because of the inherent conflicts between shareholders and policyholders, will likely result in a significant reduction in the amount of policyholder dividends is not directly presented to policyholders anywhere in the Proxy Statement. Rather, the section of the Proxy Statement entitled "Special Considerations and Risks Regarding the Plan of Reorganization” simply alludes to this concern by stating:
Potential conflicts of interest between Members[9] and potential future shareholders of Reorganized [Liberty] or the Intermediate Stock Holding Companies may arise when stock is issued to outside investors whose interests may conflict with those of Members of Liberty Mutual Holding Company.
Proxy Statement at 17. The full discussion of this issue at page 41 of the Proxy Statement adds words but sheds little, if any, light on the likely impact of this conflict of interest on policyholders’ dividends:
Various conflicts of interest may arise between Policyholders of Reorganized [Liberty] and shareholders of LMHC Massachusetts Holdings, LMGI, or Reorganized [Liberty], when and if stock in any of these companies is sold to outside investors. These types of potential conflicts exist in any corporation where there are majority and minority shareholders. Similar conflicts of interest regularly arise for the directors of stock insurance holding companies outside of the mutual holding company context, as well as for the directors of demutualized insurers. The boards of directors of each of the corporations within the Liberty Mutual Holding Company structure will strive to reconcile any such potential conflicts of interests. The directors of each of Liberty Mutual Holding Company, LMHC Massachusetts Holdings and LMGI will attempt to resolve any conflicts of interest which may develop based on the relevant facts and circumstances of each situation at the appropriate time in accordance with their fiduciary duties. Management of each of the corporations within the Liberty Mutual Holding Company structure will act in accordance with the directions of their respective boards of directors in seeking to appropriately reconcile any such conflicts of interest.
Proxy Statement at 41. The average policyholder reading this language will have only the most general understanding that, in an insurance stock corporation, there may be a potential conflict between policyholders and shareholders. Nothing in this language will help the policyholder to understand that this conflict of interest will become manifest whenever Reorganized Liberty considers whether to issue dividends to its policyholders, and that this foreseeable conflict of interest may reduce the amount paid in policyholder dividends. The language used in the Proxy Statement is not affirmatively misleading, but it is so oblique as effectively to conceal the practical financial consequence of a conflict of interest on policyholders. To have any understanding of how this conflict of interest may affect policyholder dividends, the policyholder would need to turn to pages 63-65 of the Proxy Statement, where the allegations in the plaintiffs’ complaint are listed, prefaced by Liberty’s assertion that the allegations are without merit.
3. Do the Proxy Statement and Policyholder Guide Jail to reveal that policyholders would Jare much better in a demutualization plan than in the proposed Reorganization Plan?
In a demutualization, the policyholders of a mutual insurance company receive cash, stock, or some other form of consideration from the mutual insurer’s surplus in return for their equity rights in the mutual insurer. See G.L.c. 175, §19E. As discussed earlier, Liberty has declared that its policyholders’ equity rights have yielded them no dividends in the entire history of this mutual insurer, and that, under the Reorganization Plan, these equity rights will be extinguished and replaced with new equity rights in Liberty Mutual Holding, which will continue to pay no dividends based on these equity rights. The plaintiffs contend that the Proxy Statement fails to reveal how much more favorable a demutualization would be for policyholders than this Reorganization Plan.
In evaluating this contention, it is important to note that, under Massachusetts law, Liberty, as a mutual insurance company engaged in the business of property and casualty insurance, cannot directly demutualize into a stock insurance company; only a mutual life insurance company can make this conversion directly. See G.L.c. 175, §19E. For a mutual property and casualty insurer like Liberty to demutualize, there must be a two-step process: (1) it must first engage in a reorganization, like the one proposed here, to create a mutual holding company with voting control over a reorganized stock insurance company, and then (2) it may convert the mutual holding company into a stock corporation through a demutualization. See G.L.c. 175, §§19T and 19U. Liberty’s Proxy Statement makes clear that the proposed Reorganization is a necessary step towards a subsequent demutualization and does not preclude such a demutualization in the future, but states in bold print, “No such subsequent demutualization is, however, currently contemplated and a demutualization may never occur.” Proxy Statement at 49 (emphasis in original).
There is no doubt, as Liberty recognizes, that it could have chosen to devise a Global Transaction in which the first step was this reorganization and the second step was demutualization, either immediately or when the Board determined that market conditions were appropriate. See Policyholder Guide at 8 (“Although Massachusetts law would permit a *312 demutualization immediately following reorganization into a mutual holding company structure, [Liberty] is not proposing that it or Liberty Mutual Holding Company demutualize, although that is an available option in the future if the Reorganization is approved”). The Global Transaction that Liberty proposes, however, is far different, and will result in the consolidation of affiliated insurance companies, not their demutualization.
It is also important to note that the Proxy Statement, in a section entitled, “Structural Alternatives to Plan of Reorganization,” identifies four principal structural alternatives to the Reorganization Plan, with the fourth being demutualization. See Proxy Statement at pp. 47-49. This part of the Proxy Statement declares:
In the event of a demutualization of Liberty Mutual Holding Company, Policyholders of Reorganized [Liberty] in their capacities as Members of Liberty Mutual Holding Company would receive cash, stock or other form of consideration upon the extinguishment of their Equity Rights in Liberty Mutual Holding Company, which they will not receive in the Reorganization.
Proxy Statement at 48. The Policyholder Guide also compares the Reorganization Plan with a demutualization, and makes clear that, in a demutualization, policyholders would receive compensation in the form of stock, cash, or other consideration for their equity rights, and that they will receive no consideration under the Plan.
Therefore, the Proxy Statement and Policyholder Guide identify demutualization as an alternative, inform policyholders that they would receive stock, cash, or other consideration for their equity rights in the event of a demutualization, and tell policyholders that they will receive no such consideration from the Reorganization Plan. What is left of plaintiffs’ argument on this issue, then, is that the Proxy Statement and Policyholder Guide fail to tell policyholders how much money, whether in the form of cash, stock, or other consideration, they are foregoing if they were to approve this Reorganization Plan rather than a Reorganization Plan leading immediately (or at least foreseeably) to demutualization.
It is true that neither the Proxy Statement nor the Policyholder Guide provide policyholders with any information as to how much money they could make from a demutualization. In essence, Liberty is telling its policyholders that they will not make the money they could earn from a demutualization, but it does not give any order of magnitude as to how much money policyholders are foregoing. The plaintiffs contend that this amount of money, based on the present size of the surplus, the number of Liberty policyholders, and the fair market values of other demutualized insurance stock is roughly three times the average annual premium, but there is not presently enough evidence in the record to support (or rebut) this estimate.[10]
4. Do the Proxy Statement and Policyholder Guide fail adequately to warn Liberty policyholders that the Global Transaction will seriously dilute their voting power in Liberty Mutual Holding, and essentially cede control over this parent company to policyholders in Reorganized Liberty Fire?
If the Global Transaction is consummated, Liberty’s 750,000 policyholders, Liberty Fire's 1.9 million policyholders, and Wausau’s 16,600 policyholders will all become members of Liberty Mutual Holding, with one vote apiece, regardless of the number of policies a member may hold. Proxy Statement at 35, 36. The plaintiffs observe that this will mean that Liberty’s policyholders will effectively lose voting control over Reorganized Liberty to Liberty Fire’s policyholders, who will constitute roughly 71 percent of Liberty Mutual Holding’s membership votes. The plaintiffs complain that this loss of voting control is inadequately presented to policyholders in the Proxy Statement, which simply informs policyholders that the Global Transaction will “dilute” their voting rights in Liberty Mutual Holding, but does not tell them the magnitude of the dilution. See Proxy Statement at 17-18, 46. It is true that, to obtain an understanding of the magnitude of the dilution in voting power, a policyholder would need to locate the number of current policyholders in these three mutual insurance companies on page 36 of the Proxy Statement, and perform the arithmetic oneself.
5. Synthesis
Assuming that Liberty is correct in its assertion that it has never paid any equity rights dividends, the plaintiffs are likely to establish the following three shortcomings in the Proxy Statement and Policyholder Guide:
1. While the Proxy Statement and Policyholder Guide inform policyholders that potential conflicts of interest may arise between policyholders and potential future shareholders in Reorganized Liberty, they fail to provide enough explanation of this conflict to allow policyholders to recognize that there is a significant risk that this conflict will reduce the amount of future contract dividends they will receive from Reorganized Liberty’s Board.
2. While the Proxy Statement and Policyholder Guide inform policyholders that they would receive compensation for their equity interest in Liberty from a demutualization and that they will receive no compensation from this Reorganization Plan, they provide no information to policyholders as to the approximate amount of compensation (or range of amounts) they would likely receive from a demutualization.
3. While the Proxy Statement and Policyholder Guide inform policyholders that their voting interests in Liberty Mutual Holding will be diluted from the Global Transaction, they do not assist share *313 holders to understand the magnitude of this dilution, specifically that Liberty Fire policyholders will hold more than 70 percent of the votes in Liberty Mutual Holding.
Under Massachusetts law, policyholders of a mutual insurer are afforded many of the same rights that shareholders enjoy in stock corporations. See generally Harhen v. Brown, 46 Mass.App.Ct. 793, 803 (1999), rev’d on other grounds, 431 Mass. 838 (2000); G.L.c. 175, §30(a)(4). A mutual insurer has a duty to provide its policyholders with full and honest disclosure of material facts relating to a transaction that requires policyholder approval. Cf. Royal Business Group, Inc. v. Realist, Inc., 933 F.2d 1056, 1064 (1st Cir. 1991). “An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.” TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). The standard contemplates “a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the ‘total mix’ of information made available.” Id.[11]
While they are likely to establish the three identified shortcomings in the Proxy Statement and Policyholder Guide, the plaintiffs are unlikely to prevail at trial in proving that Liberty omitted material facts from its policyholders. The reason is that, even if this information were material, Liberty can show that, by including verbatim most of the plaintiffs’ allegations from their complaint on pages 64-65 of the Proxy Statement, it did not omit this information. While this Court recognizes that the vast majority of policyholders will never read pages 64 and 65 of the Proxy Statement, the fact of the matter is that the information is there for policyholders to read and is not omitted. Pragmatically, it may be buried in plain sight, but it is not omitted.
While the Proxy Statement and Policyholder Guide may not be fraudulent, the fact remains that they effectively communicate the “pros” of the Reorganization Plan, but do not effectively communicate the “cons.” Indeed, they communicate the “pros” and “cons” of this corporate ballot question far less effectively than the League of Women Voters does each election year in providing voters with its balanced discussion of public ballot questions. Consequently, this Court is not confident that the majority of Liberty policyholders, even those who peruse the Proxy Statement and Policyholder Guide, will understand serious objections to the Reorganization Plan articulated in this action by the plaintiffs:
that Liberty policyholders will likely receive less in dividends under the Plan;
that Liberty policyholders would be much better off with a Global Transaction that led to demutualization in the immediate or near future; and
that Liberty policyholders will lose voting control over Liberty Mutual Holding and, consequently, over Reorganized Liberty when the Global Transaction becomes effective.
This Court is not saying that the plaintiffs are correct as to these objections; it is simply saying that these are serious objections that policyholders should understand well enough to accept or reject before they vote on the Reorganization Plan.
Apart from their claim of fraudulent misrepresentation, the plaintiffs allege that Liberty, through these disclosures, has breached its fiduciary duty to policyholders. This Court has earlier declared that, while a mutual insurer has a fiduciary duty to its policyholders, the law is not precisely clear as to the extent of that fiduciary duty. See supra at 10. It would seem that the mutuality of a mutual insurance company should have consequence in defining that duty. Liberty’s own creed, proudly declared on the last page of the Policyholder Guide, begins, “With our policyholders we are engaged in a great mutual enterprise.” It may be that the fiduciary duty implicit in this “great mutual enterprise” means that Liberty has a duty to make reasonable efforts to ensure that its policyholders truly understand the “pros” and “cons” before they vote on a Plan, like this, that fundamentally affects their future relationship to the company and that may significantly affect their pocketbooks. That duty may require more than simply avoiding material omissions in a book-length proxy statement; it may require an effective communication of the important “pros” and “cons” of the decision in a format that the average policyholder will read and understand so that he can intelligently exercise the right to vote. Indeed, this Court notes that the Legislature specifically required mutual insurers to include, as part of the Reorganization Plan information furnished to policyholders before the policyholder meeting, “a description of material risks and benefits to policyholders’ interests.” G.L.c. 175, § 19H(e). Implicit in this requirement is that the description be not only accurate but understandable. To the extent that Liberty’s fiduciary duty requires more than simply the avoidance of affirmative misrepresentations, the plaintiffs have a significantly greater likelihood of success on their breach of fiduciary duty claim than on their fraud claim.
While this Court doubts that most policyholders will understand from the Proxy Statement and Policyholder Guide the serious objections to the Reorgani-. zation Plan articulated in this action by the plaintiffs, this Court will not preliminarily enjoin the printing or distribution of the Proxy Statement and Policyholder Guide. As explained earlier, this Court recognizes that the preliminary injunctive relief sought by the plaintiffs is extraordinary, and that, to justify such extraor *314 dinary relief, the plaintiffs must demonstrate that the Proxy Statement and Policyholder Guide so fundamentally mislead policyholders regarding the Reorganization Plan that any vote regarding the Plan will almost certainly be deemed null and void. The plaintiffs have not met that admittedly high standard.
This Court recognizes that this decision will not be the last word on this Reorganization Plan. If the policyholders were to approve the Plan, it must still be found by the Commissioner to be “fair and equitable to the reorganized insurer’s policyholders." G.L.c. 175, §19H(d). Apart from the Commissioner’s substantive examination of the fairness of the Plan to policyholders, this case may still proceed for a final determination as to whether policyholders were provided with full, fair, and honest disclosure of the information needed by them to make their own informed decision as to whether this Plan is fair and equitable. This Court expects that Liberty’s future conduct with respect to this vote will be carefully scrutinized both by the Commissioner and this Court. Liberty, either out of respect for its policyholders or strategic advantage in future dealings with the Commissioner or this Court, volunteered yesterday to include the plaintiffs’ complaint on its website. While it is unclear how many policyholders will visit that website, this can only serve to increase the number of its policyholders who will be able to understand the plaintiffs’ concerns about the Reorganization Plan and confront the issues raised before they vote. This Court hopes (although it does not order) that Liberty, before the Proxy Statement, Policyholder Guide, and ballot reach their policyholders, will take the next step of including on its website, in the jump site presently entitled, “Mutual Holding Company Plans,” a section entitled, “Pending Litigation,” that will give interested policyholders access to the key pleadings in this case, including this decision.
ORDER
For the reasons stated above, this Court hereby ORDERS that:
The defendant Liberty’s motion to dismiss is DENIED,; and
The plaintiffs’ motion for a preliminary injunction is DENIED.

 In addition, under the Plan of Reorganization, Liberty Mutual Holding must own, either directly or indirectly, at least 51 percent of the equity value (whether voting or nonvoting) of Reorganized Liberty unless the Massachusetts Commissioner of Insurance approves a smaller equity stake.

 The Policyholder Guide, which Liberty asks its policyholders to read first, provides a summary of the Reorganization Plan and answers a number of questions it poses about the Plan.

 The complaint focuses on an earlier draft of the Proxy Statement, which has been superseded by the final statement approved by the Commissioner on July 2, 2001. This Court recognizes that the revisions of the Proxy Statement will require the plaintiffs to amend their complaint, and that this Court must examine the plaintiffs’ claims as they relate to the final Proxy Statement.

 A fifth argument — that the plaintiffs' complaint targets Liberty’s exercise of its right to petition and therefore should be dismissed under G.L.c. 231, §59H — is so frivolous that it does not merit serious consideration.

 Liberty contends that, even if it has a fiduciary duty to policyholders, this claim seeks to enforce a right of the corporation and therefore the plaintiffs must first satisfy the requirements set forth in Mass.R.Civ.P. 23.1 for derivative actions. This argument fundamentally misapprehends the nature and purpose of the plaintiffs’ claim. This is not a claim intended to remedy a wrong done to the corporation, where the recovery properly belongs to the corporation. Rather, this is a claim (and a complaint) intended to remedy a wrong allegedly being done to the policyholders directly, by inducing them to surrender their equity rights based on false, fraudulent, and misleading information in the Proxy Statement and Policyholder Guide. Therefore, it is properly brought as a class action, and not a shareholder derivative action. See Reporter’s Notes — 1973, Mass.R.Civ.P. 23.1.

 Since there are 750,000 Liberty policyholders, the balance of the Proxy Statements and Policyholder Guides appear to be designated for Liberty Fire and Wausau policyholders.

 As a corollary to this authority. Article 15 authorizes the Board to determine “what amounts in addition to amounts required by statute shall be set aside from time to time as contingent and special reserves and may also determine what part of the company’s surplus is distributable in the form of dividends or refunds ...”

 After this boldfaced assertion, the Proxy Statement reads, “See ‘Effects of the Reorganization,’ page 34,” as if this supports or clarifies the statement in bold, but there is nothing in this section that provides support for or clarifies the statement.

 In a mutual company, all policyholders are Members. In this context, the term, “Members,” is simply another characterization of policyholders.

 Plaintiffs also contend that the Proxy Statement’s description of the Fairness Opinion from Credit Suisse First Boston Corporation (“Credit Suisse”), dated September 13, 2000 and later updated to June 13, 2001, is deceptive in that it tells policyholders that Credit Suisse proffered the opinion that the Reorganization Plan and Global Transaction are “fair” to policyholders who are members of Liberty (and, subsequently, Liberty Mutual Holding) “from a financial point of view” (Proxy Statement at 18 and 30), but does not make clear that Credit Suisse did not address whether the decision to proceed with the Reorganization Plan and Global Transaction was “fair” as compared to alternatives the Board could have chosen, such as demutualization. This limitation on the scope of the Fairness Decision is found in the Decision itself, which is annexed to the Proxy Statement at D-3, but is not mentioned in the text of the Policyholder Information Statement.

 This Court recognizes that the Supreme Court established this definition in interpreting Rule 14a-9 of the Securities Exchange Act of 1934, but finds that it also states a fair and accurate definition of materiality under the common law of misrepresentation. See Zimmerman v. Kent, 31 Mass.App.Ct. 72, 78 (defining materiality in the context of a claim of misrepresentation as “whether ‘a reasonable man would attach importance (to the fact not disclosed] in determining his choice of action in the transaction in question’ ”), quoting Rogen v. Ilikon Corp., 361 F.2d 260, 266 (1st Cir. 1976).